**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KORMENDI/GARDNER PARTNERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:08-cv-00423-HHK |
| | ) |
| SURPLUS ACQUISITION VENTURE, LLC and | ) |
| GOVERNMENT LIQUIDATION.COM, LLC, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MOTION TO DISMISS PURSUANT TO RULES 12(B)(6), 12(B)(7), AND 19(B) BY
DEFENDANTS SURPLUS ACQUISITION VENTURE, LLC
AND GOVERNMENT LIQUIDATION.COM, LLC**

Defendants Surplus Acquisition Venture, LLC and Government Liquidation.com, LLC (collectively "Defendants"), through the undersigned counsel, hereby move this Court: (i) pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the Complaint by Plaintiff Kormendi/Gardner Partners (the "Complaint") for failure to state a claim and with prejudice; or, in the alternative, (ii) pursuant to Fed. R. Civ. P. 12(b)(7) and Fed. R. Civ. P. 19(b) to dismiss the Complaint without prejudice for failure to join an indispensable party, namely the United States Department of Defense, Defense Logistics Agency, Defense Reutilization and Marketing Service. Defendants have set forth the grounds for this motion in the accompanying memorandum of law, which Defendants incorporate herein by reference.

Dated:  March 17, 2008

Respectfully submitted,

ARNOLD & PORTER LLP

/s/ Craig Holman
Craig A. Holman (Bar No. 447852)
Matthew D. Michael (Bar No. 477432)
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202
Phone:  (202)-942-5000
Fax:  (202) 942-5999

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KORMENDI/GARDNER PARTNERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Case No.  1:08-cv-00423-HHK |
| | ) |
| SURPLUS ACQUISITION VENTURE, LLC and | ) |
| GOVERNMENT LIQUIDATION.COM, LLC, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PURSUANT TO RULES 12(B)(6), 12(B)(7), AND 19(B) BY DEFENDANTS SURPLUS ACQUISITION VENTURE, LLC AND GOVERNMENT LIQUIDATION.COM, LLC**

Defendants Surplus Acquisition Venture, LLC ("SAV") and Government Liquidation.com, LLC ("GL") (collectively "Defendants"), through their undersigned counsel, offer this Memorandum of Law in support of their request that this Court: (i) dismiss with prejudice, pursuant to Fed. R. Civ. P. 12(b)(6), the Complaint for Breach of Contract, Quantum Meruit and Accounting (the "Complaint") filed by Plaintiff Kormendi/Gardner Partners ("Plaintiff" or "KGP") for failure to state a claim; or, in the alternative, (ii) dismiss without prejudice, pursuant to Fed R. Civ. P. 12(b)(7) and 19(b), the Complaint for failure to join an indispensable party, the United States of America.

## I.    INTRODUCTION

At its core, this lawsuit by KGP seeks to hold Defendants liable for a dispute between KGP and the United States Department of Defense, Defense Logistics Agency, Defense Reutilization and Marketing Service ("DRMS") - a dispute that by the allegations of the Complaint (and in reality) arose on a financial services contract to which Defendants were never

even a party (the "KGP-DRMS Contract") and in which Defendants have no interest. To accomplish its apparent objective of suing DRMS, without suing DRMS, KGP concocts third party beneficiary and accounting causes of action regarding a wholly separate contract between DRMS and Defendants and a quantum meruit cause of action seeking damages from Defendants for services KGP allegedly provided to DRMS. The Complaint is baseless.

As stated in the Complaint, KGP and DRMS entered into a financial services contract in 1996 under which DRMS allegedly agreed to compensate KGP with certain proceeds from unspecified potential future contracts to which DRMS might become a party. The financial services allegedly related to the structuring of certain future DRMS contracts for the sale of Department of Defense surplus personal property. KGP allegedly provided the financial services *to DRMS* prior to 2001. In 2001, DRMS entered Contact No. 99-0001-0002 with Defendants (the "CV2 Contract") for the sale of certain useable surplus personal property. Notwithstanding KGP's allegations of third party beneficiary status, the CV2 Contract expressly declared that the sole parties to the CV2 Contract were Defendants and DRMS, expressly disclaimed KGP as a party - identifying it as a "financial advisor" *to DRMS,* and *expressly disclaimed the creation of any other relationships*. Under the 2001 CV2 Contract between DRMS and Defendants, Defendants bought certain Department of Defense surplus useable personal property from DRMS and then resold the DRMS property on the open market pursuant to a proceeds sharing model for the mutual benefit of DRMS and Defendants.

As part of the payment of DRMS's share, DRMS originally directed Defendants to transmit a small percentage of the DRMS portion of the purchase price and sales proceeds directly to KGP. As acknowledged by Plaintiff, Defendants made all such payments until late in the summer of 2006. On August 15, 2006, however, DRMS issued Modification No. 9, as

expressly allowed for under the terms of the CV2 Contract and by which *DRMS* directed that Defendants stop sending payments to KGP.  Under Modification No. 9, DRMS directed that Defendants instead direct the entirety of the DRMS amounts (including the amounts formerly directed to KGP) to DRMS.  Defendants' share of the sale proceeds remained the same.

Apparently, KGP believes that it should have continued receiving proceeds on the 2001 CV2 Contract as payment for the financial services it formerly provided to DRMS under its separate KGP-DRMS Contract.  Rather than suing for an alleged breach of its own financial services contract with DRMS, however, KGP here seeks to hold Defendants (not parties to the KGP-DRMS Contract) liable on the separate CV2 Contract to which KGP is both disclaimed as a party and a beneficiary.  KGP apparently believes that (notwithstanding the express language of the CV2 Contract) it had somehow acquired third party rights under the CV2 Contract through DRMS and that the modification issued by DRMS somehow violated those rights and renders Defendants liable for DRMS's action.  In the alternative, KGP seeks to recover on equitable grounds, such as quantum meruit and accounting, even though contracts governing both its services and the Defendants' payment obligations exist and even though Defendants have previously transmitted all funds at issue to DRMS.

As set forth more fully below, the Complaint should be dismissed for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), for several reasons.  *First*, KGP lacks standing to pursue Defendants because KGP holds no rights under the CV2 Contract between Defendants and DRMS to pursue its claim.  *Second*, KGP provided its services to DRMS, and DRMS received the monies that KGP seeks from Defendants -- thus, KGP should assert any claim for quantum meruit or unjust enrichment against DRMS, and not Defendants. *Third*, Defendants have done nothing more than follow the express, written contractual direction

of the United States as to the payment of amounts under the CV2 Contract and therefore have immunity from KGP's action under long established Supreme Court caselaw. KGP thus fails to state a claim for which relief can be granted, and the Court should dismiss its Complaint.

Alternatively, should the Court not reject the Complaint outright for failure to state a claim, Defendants assert that KGP's failure to join DRMS as an indispensable party triggers the dismissal provisions of Rules 12(b)(7) and 19. Indeed, how will the Court determine why DRMS directed by Modification No. 9 that Defendants pay the CV2 Contract proceeds directly to DRMS as opposed to DRMS and KGP? How will the Court ascertain whether KGP breached its separate financial services contract with DRMS (to which Defendants are not a party)? How will the Court ascertain the legality of any direction the Court might issue as to continuing or future revenue streams under federal appropriation laws or similar statutes? How will the Court hold Defendants liable for following the written contractual direction of DRMS without allowing (indeed, requiring) DRMS to defend its right to direct its tens of thousands of contractors without third party interference or claims? How will the Court determine whether it is proper or appropriate to direct an "accounting" of a United States Department of Defense contract without the presence of the United States Department of Defense? How will the Court direct relief against Defendants for the payment to KGP of monies that Defendants by contract have paid into DRMS and the United States Treasury without the presence of the United States?

Why KGP would advance such a strained Complaint against Defendants as opposed to seeking relief from the party with which it had contractual relations - DRMS - is less than clear. What is clear from the face of the Complaint and the CV2 Contract and its modifications cited therein is that KGP has no viable cause of action against Defendants. And further even if it had a

cause of action against Defendants, such cause would not properly lie without the presence of DRMS.

## II.    FACTS[1]

### A.    The Action

In or about late January 2008, Plaintiff filed a Complaint against Defendants in the Superior Court of the District of Columbia.  Compl. at passim.  Plaintiff, by the Complaint, seeks relief under a third party beneficiary to the CV2 contract count, a quantum meruit count, and an accounting count.  *Id.*  Defendants timely removed the action to this Court.

Plaintiff, by its breach of contract count, seeks to recover $1.5 million in purported damages from Defendants based on Plaintiff's alleged status as *a third-party beneficiary* to CV2 Contract, a contract between DRMS and Defendants.  *See* Compl. ¶ 1, Ex. A ("KGP sues SAV and GL to enforce its rights as a *third party beneficiary* of a contract between the Defendants and the Defense Reutilization and Marketing Service."))  Plaintiff is *not* a party to the CV2 Contract under which Plaintiff claims third-party beneficiary status.  CV2 Contract at VI, Art. I § 8(A), Ex. B.[2]  Instead, Plaintiff claims that its alleged standing as a third party beneficiary under the CV2

---

[1] Because Defendants file this Motion pursuant to Fed. R C. P. 12, Defendants have drawn the facts cited below from Plaintiff's Complaint and the documents referenced by the Complaint.  Defendants have accepted the allegations of the Complaint set forth below as true solely for the purposes of this Motion.

[2] In considering the legal sufficiency of a complaint under a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court may properly consider certain materials outside of the complaint without converting the motion into one for summary judgment.  *See, e.g.*, *Krooth & Altman v. N. Am. Life Assurance Co.*, 134 F.Supp.2d 96, 99 (D.D.C. 2001) (citing *Sharpe v. Nat'l Football League Players Ass'n*, 941 F. Supp. 8, 10 n. 1 (D.D.C.1996)).  "[W]here a document is referred to in the complaint and is central to plaintiff's claim, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment."  *Vanover v. Hantman*, 77 F.Supp.2d 91, 98 (D.D.C. 1999); *cf. Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002) (on a motion to dismiss, the Court may consider documents, including contracts, "whose contents are alleged in the complaint and whose authenticity no party questions," even though they "are not physically attached to the pleading.").  In this matter, the CV2 Contract and its modifications fall into this category, as Plaintiff repeatedly refers to the CV2 Contract in its Complaint.  Defendants have attached excerpts of the CV2 Contract as Exhibit B, Modification No. 9 as Exhibit C, and Modification No. 11 as Exhibit D.

Contract arises from a *separate* federal contract for consulting services between Plaintiff and DRMS - the KGP-DRMS contract - a contract to which Defendants are not parties.  *See* Compl. ¶¶ 14-22.[3]

Plaintiff, by its quantum meruit count, seeks $1.5 million in damages against Defendants for services Plaintiff allegedly provided to DRMS under the KGP-DRMS contract.  *See id*. ¶¶ 105-113.

Plaintiff, by its accounting count, seeks a court ordered audit of the *federal* CV2 Contract between DRMS and Defendants.  *See id*. ¶¶ 105-113.

### B.    The Parties

Defendants SAV and GL sell surplus Government personal property to the public, using an internet website, http://www.govliquidation.com.  In essence, Defendants' operate as a logistics support service and on-line auction in which customers bid for and purchase surplus personal property.

DRMS is an office within the United States Department of Defense.  *Id*. ¶ 12.  DRMS has responsibility within the Department of Defense for the disposition of used, formerly Government-owned property.  *Id*.  One way in which DRMS achieves its mission is by selling property to private companies, that in turn resell the property in the open market ("Commercial Ventures" or "CVs").  *Id.* ¶ 13.

KGP is a DC-based consulting partnership that apparently formerly provided services to DRMS.  Compl. ¶¶ 6, 14.

---

[3] The Complaint does not explain why Plaintiff has not sued the party which ordered its services and with which Plaintiff apparently has a contractual disagreement - the United States.

### C.    The KGP-DRMS Contract And The CV2 Contract

In 1996, DRMS and KGP allegedly entered the KGP-DRMS Contract - a financial advisory contract designed to allow KGP to assist DRMS in selling used property.  Compl. ¶¶ 15-17.  The KGP-DRMS Contract allegedly provided that DRMS would pay KGP for its services by DRMS allocating to KGP a percentage of the proceeds on any future potential commercial venture resales.  *Id.* ¶¶ 18, 19.[4]  Defendants are not parties to the KGP-DRMS Contract.  *Id.*

KGP alleges that, under the KGP-DRMS Contract, KGP developed a property resale structure (the "CV Program") for DRMS by which a private company would buy used Government property, with a portion of the purchase price going to DRMS and another portion being allocated to KGP.  *Id.* ¶ 24.  If the contractor could sell the property on the open commercial market, then it would remit a certain percentage of the net profits to DRMS, another percentage to KGP, and then keep the remainder for itself.  *Id.*

KGP asserts that DRMS put this system into place in 1998, when it entered into a contract ("the CV1 Contract") with a firm called Levy/Latham LLC ("Levy").  *Id.* ¶ 25.  Pursuant to the CV1 Contract, Levy formed a corporation, Levy/Latham Global ("LLG") for the sole purpose of buying and reselling DRMS property.  *Id.* ¶ 26.

Defendants were not affiliated with Levy or LLG, and did not take part in the CV Program until 2001 when Defendant SAV purchased both Levy and LLG, and assumed their rights and obligations under the CV1 Contract.  *Id.* ¶ 36.

---

[4] Although KGP apparently relies on this KGP-DRMS Contract - a contract to which Defendants are not parties - as a source of its rights, KGP did not attach the alleged KGP-DRMS Contract to its Complaint.

On June 13, 2001, DRMS awarded and entered into a second CV contract - the CV2 Contract - with Defendant SAV. *Id.* ¶ 34. SAV, in turn, formed Defendant GL to serve as purchaser for the CV2 Contract, similar to the manner in which Levy had formed LLG to serve as the purchaser for the CV1 contract. *Id.* ¶ 35.

The CV2 Contract defined the parties to the contract as "DRMS, Contractor [SAV] and, pursuant to the provisions of Section 10 of this Article 1, Purchaser [GL]." CV2 Contract at VI, Art. I § 8(A), Ex. B  The CV2 Contract also noted that Plaintiff was the "DRMS Financial Advisor" and was "*neither a party to the contract nor an agent of DRMS for any purpose.*" *Id.* (italics added).)

The CV2 Contract reserved to DRMS the right to change by notice the CV2 Contract's payment terms: "Unless otherwise provided by notice, all payments to DRMS and to KGP shall be made and delivered pursuant to the following instructions, which instructions may be changed by written notice to Purchaser." *Id.* at VI, Art. V § 2(D). The CV2 Contract also contemplated that the parties -- DRMS and Defendants -- could change other terms of the CV2 Contract: "No change or modification of, or waiver or compromise under, this contract shall be valid unless it is in writing and signed by a duly authorized representative of *the party* against which it is to be enforced." *Id.* at VI, Art. XXII § 10 (italics added). Neither of these provisions required the consent or approval of KGP or any other third party. *Id.*

Shortly after DRMS awarded the CV2 Contract, DRMS consented to SAV consolidating the CV1 Contract into the CV2 Contract. Compl. ¶¶ 36, 37. The CV2 Contract as issued directed GL to remit DRMS's 100 percent of the purchase price - 97.75 percent to DRMS and 2.25 percent to KGP. *Id.* ¶¶ 39, 40. To the extent GL could resell the property, the CV2 Contract required GL to allocate net proceeds from the sales of 80 percent to DRMS (78.2

percent to DRMS and 1.8 percent to KGP) and 20 percent to the CV2 Contractor - SAV. *Id.* ¶¶ 42, 43.

Plaintiff asserts that "it received what it was due under the CV2 Contract until the summer of 2006. At that time, Defendants stopping making payments to Plaintiff under the CV2 Contract." *Id.* ¶ 61. The payments to Plaintiff under the CV2 Contract stopped because DRMS - - the only party with which Defendants had a contract -- so directed Defendants by CV2 Contract modification and thereby removed whatever alleged interest Plaintiff claims in the Contract:

> NOW, therefore, it is mutually agreed between the parties hereto that, effective with Delivery Order 254, KGP will no longer be entitled to payment (upfront/resale) for property transferring to purchaser under contract 99-0001-0002. KGP will be entitled to proceeds sharing arrangement (resale) set forth in contract 99-0001-0002 for all property transferred to purchaser prior to delivery order 254. Effective with Delivery Order 254, the payment originally directed to KGP will be included in the proceed sharing arrangement to DRMS, thus making DRMS share equal to 80% rather than 78.2% after deducting KGP's portion.

*See* Modification No. 9, Ex. C. Also of significance, DRMS, by Modification No. 9, directed GL to deliver the entire DRMS share - including the KGP amounts - to DRMS. *See id.*

Modification No. 9, therefore, ended KGP's receipt of proceeds from the CV2 Contract and Defendants sent the funds previously sent to KGP directly to DRMS.

## III.    LEGAL ANALYSIS

The Court should dismiss the Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) or because joinder of an indispensable party is not feasible under Rules 12(b)(7) and 19(b). At bottom, KGP seeks to assert causes of action against Defendants based on an alleged DRMS breach of the KGP-DRMS Contract -- a contract to which Defendants were not parties. Indeed, the Complaint and the CV2 Contract documents referenced therein establish beyond peradventure that this Complaint is nothing more than an ill-advised attempt to invent

causes of action where none exist so that KGP can extort by litigation from Defendants funds purportedly due Plaintiff from the United States.

**A.    The Court Should Dismiss The Complaint For Failure To State A Claim.**

Several bases exist on which this Court should dismiss the Complaint for failure to state a claim. First, the Complaint on its face and including the documents referenced therein, evidences that KGP lacks standing to pursue any of its breach of CV2 Contract and accounting claims, as KGP is not a party and does not enjoy any enforceable rights under the CV2 Contract. Second, the Complaint cannot set forth a claim under quantum meruit, as KGP's payments were governed by express written contractual provisions - the admitted KGP-DRMS Contract. Moreover, even if a quantum meruit claim were possible, KGP fails to set forth a cognizable claim against Defendants, as KGP did not provide its services to Defendants and no unjust enrichment of Defendants occurred. Third, Defendants enjoy immunity from this suit as the challenged actions were taken at the express, written direction of DRMS, under a contract affecting national security and the federal interest.

**1.    Legal Standard**

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests whether a complaint properly sets forth legal claims on its face. *Rempfer v. Von Eschenbach*, No. 06-2131(RMC), 2008 WL 540241, at *4 (D.D.C. Feb. 29, 2008). Although the complaint need not contain detailed factual allegations, it must at least provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1964-65 (2007) (internal citations omitted). While courts must treat the factual allegations in a complaint as true, *Macharia v. United States*, 334 F.3d 61, 64 (D.C. Cir. 2003), the facts alleged "must be enough to raise a right to relief above the speculative level," *Twombly*,

127 S.Ct. at 1965. The Court need not accept "unsupported, conclusory allegations" as true when they are "unsupported by facts set out in the complaint or [are] legal conclusions cast as factual allegations." *Elemary v. Phillipp Holzmann A.G.*, No. 07-654 (RCL), 2008 WL 316376, at * 12 (D.D.C. Feb. 6, 2008); *Rempfer*, 2008 WL 540241, at *4; *Chandamuri v. Georgetown Univ.*, 274 F. Supp. 2d 71, 78 (D.D.C. 2003) (quoting *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002)). If a plaintiff's allegations do not cross "the line from conceivable to plausible, the[] complaint must be dismissed." *Twombly*, 127 S.Ct. at 1974.

### 2. KGP Lacks Standing to Sue Defendants Under the CV2 Contract, Requiring Dismissal of the Breach of Contract and Accounting Counts.

Central to the standing consideration is whether Plaintiff is the proper party to bring a matter to the Court for adjudication. Here, Plaintiff lacks standing to bring the Complaint because Plaintiff is not a party to the CV2 Contract and has no third-party rights. Indeed, even if KGP did somehow acquire a third-party interest despite the express language of the CV2 Contract to the contrary, DRMS terminated any such putative rights through Modification No. 9.

### a. KGP is not a party to the CV2 Contract.

The ordinary rule is that only parties to an agreement have standing to enforce its provisions. *Rottlund Homes of N.J., Inc. v. Saul, Ewing, Remick & Saul, L.L.P.,* 243 F.Supp.2d 145, 153 (D.Del. 2003) ("As a general matter, only a party to a contract has standing to enforce a contract and sue for breach of that contract."); 13 WILLISTON ON CONTRACTS § 37:1 (4th ed. 2007).

In this case, the CV2 Contract specifically identifies three parties *and* excludes KGP:[5]

---

[5] Defendant SAV was the "Contractor" under the CV2 Contract, and formed Defendant GL, a subsidiary, to serve as "Purchaser" for purpose of the Contract. Compl. ¶ 38.

> The parties to this contract are DRMS, Contractor, and, pursuant to the provisions of Section 10 of this Article 1, Purchaser [GL]. . . . . Kormendi/Gardner Partners ("KGP") is the DRMS Financial Advisor. *KGP is neither a party to the contract nor an agent of DRMS for any purpose.*

CV2 Contract at VI, Art. I § 8(A) (italics added), Ex. B.

KGP *is* a party to a separate financial advisory services contract with DRMS, however, whereby KGP allegedly agreed to help set up a property disposition regime that DRMS could use in its future dealings. Compl. ¶¶ 14, 17-19. Thus, KGP may possess standing to sue DRMS for breach of the KGP-DRMS Contract -- but KGP does not have standing to sue for breach of the CV2 Contract. Accordingly, KGP should have brought suit against the real party in interest (DRMS) on the real contract at issue (the KGP-DRMS Contract).

Because KGP is not a party to the CV2 Contract, KGP cannot sue Defendants for breach of the CV2 Contract and the Court should dismiss this action. *See, e.g.*, *United States v. Race*, 632 F.2d 1114, 1120 (4th Cir. 1980) (district court should have granted defendant's motion to dismiss where contract language was plain).

### b.    The CV2 Contract prevents any claim by KGP of third-party beneficiary status.

In order to state a claim as a third-party beneficiary, KGP must sufficiently allege contract provisions and facts showing that the "parties to the contract clearly and definitely intended it to confer a benefit upon [it]." *Food Lion, Inc. v. S. L. Nusbaum Ins. Agency*, 202 F.3d 223, 229 (4th Cir. 2000); *cf. Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1259 (Fed. Cir. 2005) (contract must reflect express or implied intention to benefit the party directly) (citation omitted); *Montana v. United States*, 124 F.3d 1269, 1273 (Fed. Cir. 1997) (adopting rule in *Schuerman v. United States*, 30 Fed. Cl. 420, 433 (Fed. Cl. 1994), that test for third-party beneficiary status "is whether the contract reflects the express or implied intention of the parties

to benefit the third party"); 13 Samuel Williston, Treatise on the Law of Contracts, § 37:8 (4th ed. 2000). In short, the law allows KGP to seek enforcement of the CV2 Contract as a third-party beneficiary only "if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties." Restatement (Second) of Contracts § 302 (1981); *Flexfab*, 424 F.3d at 1259-60 (the intent of the parties to the contract is "the cornerstone of a claim for third-party beneficiary status"). *Since third-party beneficiary status is exceptional in the law, "the privilege should not be granted liberally." Flexfab*, 424 F.3d at 1259.

As noted in the previous section, the very terms of the CV2 Contract express the intent of the parties to the CV2 Contract with respect to KGP's rights: KGP has none. The CV2 Contract specifies in unmistakable terms that the sole parties to the CV2 Contract are DRMS and the Defendants. CV2 Contract at VI, Art. I § 8, Ex. B. The CV2 Contract further states that KGP "is the DRMS Financial Advisor. KGP is neither a party to the contract nor an agent of DRMS for any purpose." *Id.* Defendants submit that it would have been difficult for DRMS and the Defendants to be clearer in the intent that KGP lacks third-party beneficiary rights.

Notwithstanding the unambiguous intent of the parties in the CV2 Contract, however, KGP appears to allege that receipt of payments from the CV2 Contract somehow vests it with third-party beneficiary rights. *See* Compl. ¶¶ 1, 91, 97. Yet, the payment remittance provisions in the CV2 Contract did nothing more than direct Defendant GL, for reasons of efficiency and convenience to DRMS, to deliver DRMS funds to a DRMS service-provider for the convenience of DRMS. The Court in *Corrugated Paper Products, Inc. v. Longview Fibre Co.*, 868 F.2d 908 (7th Cir. 1989), faced a similar factual situation. In that case, the Seventh Circuit rejected a third-party beneficiary claim and found that a contract's mere provision for delivery of product to a third party under a contract is insufficient to create third-party beneficiary rights in the

13

recipient. *Id.* at 911. The court thus stated the general rule that "a third party is not a beneficiary of a sales agreement merely because both contracting parties knew that the product would be resold to the third party." *Id.* at 911. The court also concluded that the contract's provision for direct delivery to a subsequent purchaser provided no basis to conclude that the shipper intended to become entwined in a contractual relationship with the subsequent purchaser. *Id.* at 911. Just as in the *Corrugated* case, the fact that Defendants knew that a portion of proceeds was to be delivered to KGP does not provide KGP third-party beneficiary rights to sue for relief on the CV2 Contract against Defendants and the Court should not require that Defendants become entwined in a dispute between DRMS and KGP.

> ### c. Even if KGP at some point had third-party rights under the CV2 Contract the rights were properly terminated.

Even if KGP were somehow able to plead facts or cite contractual provisions showing the parties' intent to vest KGP with purported third-party rights, there can be no dispute that the CV2 Contract allowed modifications affecting those rights and that any such rights of KGP were lawfully terminated with Modification No. 9.

It is black-letter law that "After the third person accepts, adopts or acts upon the contract entered into for his or her benefit, the parties thereto cannot rescind or modify it without his or her consent so as to affect or deprive him or her of any rights thereunder, *in the absence of a reservation of the right of rescission or modification in the contract.*"  17A AM. JUR. CONTRACTS § 451 (2d ed. 2008) (emphasis added); *Lucas v. Bechtel Corp., et al,* 800 F.2d 839, 848-49 (9th Cir. 1986) (rejecting plaintiffs' third party beneficiary claim under contract between national union and construction company, where agreement provided for modification by mutual consent of the parties)

Here, the CV2 Contract expressly reserved to DRMS the right to change by notice the CV2 Contract's payment terms:  "Unless otherwise provided by notice, all payments to DRMS and to KGP shall be made and delivered pursuant to the following instructions, which instructions may be changed by written notice to [Defendant GL]."  CV2 Contract at VI, Art. V § 2(D), Ex. B. Moreover,  the CV2 Contract also contemplated that the parties -- DRMS and Defendants -- could change the terms of the CV2 Contract at any time:  "No change or modification of, or waiver or compromise under, this contract shall be valid unless it is in writing and signed by a duly authorized representative of the party against which it is to be enforced." *Id.* at VI, Art. XXII § 10. Also reflecting the will of the parties, neither of these modification provisions required consent from KGP.

As a result, even if KGP were vested with third-party beneficiary rights, KGP cannot now allege a breach of the CV2 Contract between DRMS and the Defendants because: (i) KGP was on notice from the time DRMS and Defendants entered into the CV2 Contract that the terms of the CV2 Contract were subject to change;[6] and (ii) the CV2 Contract does not require KGP's consent prior to modification of the CV2 Contract.  Thus, to the extent that KGP might have ever possessed any third-party rights under the CV2 Contract -- a proposition that Defendants strongly contest -- those rights were properly terminated through the adoption of Modification No. 9.[7]

Lacking CV2 Contract party or third party status, KGP's claims for breach of contract and accounting of the CV2 Contract necessarily fail.

---

[6] From the time of its execution, the CV2 Contract required only that DRMS propose changes in writing, and that Defendants sign off on the proposal.  CV2 Contract VI, Art. 22, § 10, Ex. B.
[7] Again, Defendants note that KGP's allegations regarding Modification No. 11 lack effect, as that modification postdated KGP's severance from the CV2 payment transmittal regime.  Compl. ¶¶ 68-73, 95. KGP also suggests that the SV Contract was modified improperly, *id.* ¶ 75, another fact that lacks relevance as neither Defendant SAV nor Defendant GL is a party to the SV Contract.

### 3.        KGP Fails to State a Cognizable Claim for Quantum Meruit.

#### a.        KGP cannot pursue a quantum meruit claim because its services were provided pursuant to a KGP-DRMS written contract.

A party may not recover under a quantum meruit count where a written contract governing the matter in question exists.  *See Ellipso, Inc. v. Mann*, 460 F. Supp. 2d 99, 104 (D.D.C. 2006); *Chancellor v. L.J. Hooker Commercial Real Estate, Inc.*, 690 F. Supp. 35, 39 (D.D.C. 1988); *see Modern Elec., Inc. v. Ideal Elec. Sec. Co., Inc.*, 81 F.3d 240, 247-48 (D.C. Cir. 1996).  This hornbook rule exists so that a party does not obtain equitable relief through a quantum meruit claim when a written contract specifically sets forth a parties' remedies.  *Finard & Co., Inc. v. Capitol 801 Corp.*, 749 F. Supp. 15, 18 (D.D.C. 1990); *Standley v. Egbert*, 267 A.2d 365, 368 (D.C.1970) ("[q]uantum meruit [ ] is not applicable when compensation of the parties is covered by an express written contract.").

In this case, the Complaint repeatedly refers to the KGP-DRMS Contract for financial services.  Compl. ¶¶ 14-18.  In other words, a contract exists covering the services for which KGP seeks quantum meruit reimbursement.  Because this action is nothing more than KGP's effort to recover from Defendants for DRMS's purported breach of the KGP-DRMS Contract, any theory based on quantum meruit against Defendants is foreclosed.

#### b.        KGP also fails to advance elemental facts sufficient to allow for a quantum meruit count.

Quantum meruit is a measure of recovery that applies in either of two circumstances: implied-in-fact contract, in which an actual, valid contract is established by the parties' conduct; or quasi contract, in which no agreement is established by the parties' conduct but the defendant has been unjustly enriched.  *Vereen v. Clayborne,* 623 A.2d 1190, 1193 (D.C. 1993).  In the implied-in-fact context, a quantum meruit plaintiff must allege that: (1) the plaintiff provided

valuable services; (2) to the defendant; (3) that the services were accepted, used, and enjoyed by the defendant; and (4) under such circumstances that the defendant knew that the plaintiff, in performing such services, expected payment by the defendant. *Id.; Bloomgarden v. Coyer,* 479 F.2d 201, 209-10 (D.C. Cir. 1973) (reciting elements of implied-in-fact contract).[8]   For a claim of quasi-contract quantum meruit, a plaintiff must sufficiently allege that the defendant was unjustly enriched at the plaintiff's expense, and under the circumstances the defendant in good conscience should make restitution.  *Vereen,* 623 A.2d at 1193; *Bloomgarden,* 479 F.2d at 209-10.

In this case, KGP is barred from proceeding under a quantum meruit theory as a threshold matter because it was a party to the contract -- the KGP-DRMS Contract -- which governs its rights (if any) to payment.  Even if KGP could pursue recovery by quantum meruit in this case, however, the Complaint states neither a cognizable implied contract nor a quasi-contract theory as a matter of law.[9]  More specifically, KGP cannot pursue an implied contract theory because KGP provided no services to Defendants and because at the time KGP provided its services, neither KGP nor Defendants could not possibly have expected Defendants to pay for KGP's services.  As for quasi-contract, the services KGP allegedly provided did not enrich Defendants at KGP's expense because: KGP, by definition, provided financial services to DRMS - not Defendants; and DRMS received the post-Modification No. 9 additional funds.

---

[8] "To establish an implied-in-fact contract to pay for services, the party seeking payment must show (1) that the services were carried out under such circumstances as to give the recipient reason to understand (a) that they were performed for him and not for some other person, and (b) that they were not rendered gratuitously, but with the expectation of payment from the recipient, and (2) that the services were beneficial to the recipient."  479 F.2d 209-10

[9] KGP's quantum meruit claim appears to track generally the elements of the implied in contract theory. *See* Compl.  ¶¶ 106, 107, 110.

### i.      KGP did not provide its services to Defendants.

As an initial matter, the Complaint does not allege much less establish that KGP provided any services to the Defendants.  To the contrary, the Complaint alleges that KGP provided financial services to DRMS in the 1990s under a contract to which Defendants were not even privy.  Compl. ¶¶ 14, 17 ("DRMS awarded a contract . . . to KGP *to provide financial services to DRMS*"; "Under the contract, *KGP assisted DRMS* in the formulation and implementation of methods to employ the private sector for selling excess Department of Defense ("DoD") property") (emphasis added).    And the CV2 Contract on which KGP claims third party beneficiary status states expressly that KGP is a "DRMS Financial Advisor," *see* CV2 Contract VI, Art. I, § 8(B); it does not indicate any relationship whatsoever, financial or otherwise, between KGP and Defendants.

The Complaint does nothing more than make conclusory allegations that KGP's services pursuant to the KGP-DRMS Contract conferred some sort of derivative benefit on Defendants and that the derivative benefit somehow gives rise to an equitable obligation for Defendants to now pay funds out of their own account.  *See*, *e.g.*, Compl. ¶¶  106, 109, and 112.  Were that only the law, the entirety of the neighborhoods around the new Nationals baseball stadium that have seen their property values increase would need litigation insurance for fear that a stadium contractor might prefer to sue them as opposed to the stadium owner for unpaid services.  The theory is preposterous.  The presence of a secondary or incidental benefit is insufficient as a matter of law to recover on a quantum meruit theory:  plaintiffs must provide services to the defendant *directly*.  *See H.G. Smithy Co. v. Wash. Med. Ctr., Inc.,* 374 A.2d 891, 893 (D.C. 1977) (implied contract plaintiff must demonstrate that defendant had reason to understand that plaintiff's "services were rendered for the [defendant] and not for some other person"); *4 Hour*

*Wireless v. Smith,* 2002 WL 31654963, at *2 (S.D.N.Y. Nov. 22, 2002) (quoting *Kagan v. K-Tel Entm't., Inc.,* 172 A.D.2d 375, 376 (N.Y. App. Div. 1991) ("[I]f services were performed at the behest of someone other than the defendant the plaintiff must look to that person for recovery")).

> **ii.    At the time it performed its services, KGP understood that DRMS (not Defendants) had responsibility to pay for KGP's alleged services.**

The Complaint also fails to sufficiently allege that KGP, in performing its services, expected to payment by Defendants.  *Vereen,* 623 A.2d at 1193.  In fact, the face of the Complaint establishes unequivocally that KGP could have had no expectation of Defendants as Defendants and the CV2 Contract did not even exist when KGP commenced providing services to DRMS in 1996!  *See* Compl. ¶¶ 15, 34-36.

Instead, the Complaint contains conclusory allegations that Defendants knew of a DRMS duty to pay KGP, summarily stating that Plaintiff was "to be paid out of proceeds from the disposition of CV Property"; that KGP's services "were rendered under such circumstances that reasonably notified the Defendants that KGP expected to be paid for its services out of the proceeds of CV transactions"; and that "KGP has repeatedly informed the Defendants that they have failed to compensate KGP for the services provided to Defendants and DRMS."  Compl. ¶¶ 107, 108.  Yet, KGP cannot state a quantum meruit claim by simply proffering conclusory allegations concerning its *own* expectation of payment.  Instead, KGP must allege that, at the time KGP designed the CV Program - provided the services for which its claims quantum meruit recovery, Defendants themselves knew that Defendants had an actual duty to pay KGP.  *See*

*Bloomgarden,* 479 F.2d at 210 (rejecting implied contract theory where developers did not know, at the time broker introduced them, that broker would expect a finders fee for his services).[10]

In this case, the Complaint demonstrates that, at the time KGP designed the CV Program, Defendants did *not* know of KGP's expectation of payment from Defendants or of any actual duty owed to KGP.  First, Defendants were not involved with the CV Program until roughly *five years after* the execution of the KGP-DRMS Contract and well after KGP allegedly provided the services for which it asserts it is due compensation.  *See* Compl. ¶¶ 36, 37.  Second, KGP rendered no services to Defendants under the CV2 Contract.  *See* CV2 Contract at VI, Art. I § (8), Ex. B.  Third, the CV2 Contract reserved to DRMS the right to change by notice the CV2 Contract's payment terms to KGP, CV2 Contract at VI, Art. V § 2(D), which would have been untenable had Defendants perceived a duty on their own part to render payments to KGP.  Fourth, the remittance of payments by Defendants did not represent any sort of actual financial obligation that Defendants owed to KGP for services rendered, but instead was an administrative function Defendants owed DRMS.  As noted earlier, the Complaint nowhere alleges that KGP provided services to Defendants directly.  DRMS received services from KGP - prior to the existence of CV2 Contract and indeed prior even to the existence of Defendants.  As a result, it

---

[10] As with implied contract claims, courts have also rejected quasi contractual claims where, as here, the services in question were provided without defendants' contemporaneous knowledge of the plaintiff's expectation of payment.  *See, e.g., Brannock Assoc., Inc. v. Capitol 801 Corp,* 807 F.Supp. 127, 131 (D.D.C. 1992) (granting summary judgment for assignee on real estate broker's unjust enrichment claim, when real estate broker had provided its services not to assignee, but to assignor; and where real estate broker had not put assignee on notice that it expected payment from assignee for its services); *Bloomgarden,* 479 F.2d at 212 n. 66 ("As in the instance of an implied-in-fact contract, the circumstances allegedly creating a quasi-contractual obligation to pay for services must have existed when the services were performed.  *No unfairness results from the denial of compensation to the claimant who had no expectation of personal remuneration at the time of performance.*  On the contrary, it would be unjust to impose a liability for payment on the party who accepts the services without any warning, from the surrounding circumstances or otherwise, that they were rendered for a price.").

does not matter that, as alleged payment for KGP's prior work for DRMS, KGP expected DRMS to require various contractors to pay KGP. *Id.* ¶¶ 18, 19.

> ### iii. Defendants were not unjustly enriched because Defendants did not receive any services from Plaintiff and remitted the involved funds to DRMS.

To the extent that KGP's quantum meruit count rests on a quasi-contract theory, the Court should dismiss the count because it fails to allege that Defendants have been unjustly enriched. *Vereen,* 623 A.2d at 1193. Unjust enrichment occurs when the plaintiff conferred a benefit on the defendant, the defendant retains the benefit, and under the circumstances, the defendant's retention of the benefit is unjust. *New World Commc'ns, Inc. v. Thompsen,* 878 A.2d 1218, 1222 (D.C. 2005); *Bloomgarden,* 479 F.2d at 210. The "unjust" element is the most critical element. *See* 66 AM. JUR. 2D RESTITUTION § 12, 13 ("The most significant element of the doctrine of unjust enrichment is whether the enrichment of the defendant is unjust"; "recovery based on unjust enrichment depends upon a showing that the parties have money . . . they ought not be allowed to retain, and which . . . belongs to another."). In general, the touchstone of unjust enrichment claims is that "the enrichment to the defendant must be unjust in that the defendant received a true windfall or 'something for nothing.'" *Id.*

As discussed above, the Complaint offers nothing more than bare allegations of indirect benefit conferred on Defendants from the services KGP provided to DRMS as part of the separate 1990s KGP-DRMS Contract. More to the point, the allegations in the Complaint reveal that at no time did KGP and Defendants enter into any contract or other relationship and at no time did Defendants seek, pay for, ask for, or receive, any services from KGP. By discontinuing the transmittal of DRMS's payment to KGP at DRMS direction and paying such amounts to DRMS as DRMS directed (see Modification No. 9, Ex. C), Defendants did not receive

"something for nothing" -- because Defendants never sought, and KGP never gave, any services to Defendants.  Should the Court hold otherwise, every consultant that assists the United States with the drafting of a solicitation or its specifications will gain the right to sue the contractor that ultimately receives the contract.

Moreover, when DRMS modified the CV2 Contract and ceased the transmittal of DRMS's payments to KGP, Defendants share of the CV2 Contract proceeds did not change.  The impact to the DRMS allocation formula in Modification No. 9 was that the 1.8 percent share previously transmitted to KGP was remitted directly to DRMS.  The Complaint and Modification No. 9 thus establish that Defendants likewise did not accrue any financial benefit from the change in remittance structure.[11]

Accordingly, KGP cannot state a claim for quantum meruit as a matter of law.

### 4. The United States Specifically Directed the Challenged Conduct Immunizing Defendants from Suit.

KGP also is barred from recovering against Defendants here because Defendants are government contractors that lawfully executed the written contractual direction of the Department of Defense.  Any other result would undermine the federal contracting system.  Indeed, Plaintiffs apparently believe that Defendants (unlike Plaintiffs - which did nothing for two years after Modification No. 9) should have rejected the DRMS direction - declaring it adverse to Plaintiff's interest, even though Plaintiff itself apparently has not challenged DRMS and Defendants have no idea what, if any, rights Plaintiff has with respect to DRMS.

---

[11]  Another aspect undermining legal assertions of unjustness is that the Contract specifically reserved the ability of DRMS to change the remittance allocation to KGP at any time and preserved the rights of Defendants and DRMS to modify other terms of the CV2 Contract at any time.  CV2 Contract at VI, Art. V § 2(D) and Art. XXII § 10.  KGP was therefore on notice from the time of that contract's formation that the invoicing and payment structure established under the CV2 Contract, as well as numerous other provisions, were subject to change at any time without any recourse to KGP.

The rule shielding government contractors from liability where they act at Government direction is well established in American jurisprudence. In the landmark case of *Yearsley v. W.A. Ross Construction*, 309 U.S. 18 (1940), for instance, the Supreme Court applied the longstanding rule to shield a contractor from liability for performing actions at the direction of the Government. In *Yearsley*, the Government charged a contractor with building certain dikes that led to erosion damage for various private property owners. In discussing whether the affected parties could recover against the contractor, the Court stated:

> it is clear that if this authority to carry out the project was validly conferred, that is if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will. Where an agent or officer of the Government purporting to act on its behalf has been held to be liable for his conduct causing injury to another, the ground of liability has been found to be either that he exceeded his authority or that it was not validly conferred.

*Id.* at 20-21 (citations omitted). This rule applies to the present matter, as the Complaint fails to allege improprieties with respect to the Government's ability to alter the CV2 Contract or any improper actions by Defendants in executing the Government's directives. Modification No. 9 referenced in the Complaint and properly considered in connection with this Motion establishes conclusively that DRMS specifically directed the challenged payment action - immunizing Defendants from this lawsuit.

The Supreme Court expanded the immunity of government contractors to suit even to actions that did not involve specific direction of the Government in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), and again found that when contractors act to implement a discretionary decision by the Government, the contractors are shielded from private liability. Motivating the *Boyle* Court was the principle that, even though the litigation at issue involved only private parties, contractors will pass through the costs of potential liability to the

Government -- including by demanding higher prices in the contract or by declining to enter the contract altogether.  487 U.S. at 507.

Courts have since applied the *Boyle* reasoning to contractors in a host of ways, including tort actions, military procurement contracts, and performance contracts.  *See, e.g.*, *Askir v. Brown & Root Servs. Corp.*, No. 95-Civ.-11008(JGK), 1997 WL 598587, at *5 (S.D.N.Y. Sept. 23, 1997) (collecting cases across contexts).  In the service contract cases, the courts have applied a modified version of the *Boyle* test, considering only whether the Government approved reasonably precise specifications for the support activities and whether the contractor operated under the direction and control of the Government.  *See, e.g.*, *id.* at *6.

The *Boyle* reasoning applies to this case, especially because the Complaint represents little more than an effort to have Defendants pay for a dispute between KGP and DRMS on the separate KGP-DRMS Contract.  The CV2 Contract sets forth precise direction for Defendants with respect to payment allocations based on the sales.  *See, e.g.*, CV2 Contract at VI, Art. V § 2, and Art. XVI § 3, Ex. B.  DRMS, as allowed for by the CV2 Contract, issued Modification No. 9 changing that direction.  See Modification No. 9, Ex. C.  Defendants accepted and followed that direction.  As a result, this case is a logical application of *Boyle*.

Most importantly, the policy issues at work in *Boyle* should motivate the Court in dismissing the Complaint here.  Defendants were clearly acting on behalf of DRMS -- they received no additional compensation from the implementation of Modification No. 9, as the change in payment allocation benefited solely DRMS.  If Defendants face liability here, surely they and other contractors will be recalcitrant in accepting future contract modifications proposed by the Government.  Future contractors, including Defendants, will likely demand additional compensation or other insurance from the Government -- if they choose to accept or

enforce the modification at all.  Such an outcome is precisely what the *Boyle* court feared, as it would raise the Government's costs in doing business and compromise its ability to obtain the goods and services the Government needs.   Of course, the fact that DRMS is an agency in the Department of Defense, the fact that DRMS is the real party in interest here, and the fact that this contract implicates national security only heightens the salience of these policy concerns.  Accordingly, Defendants should receive the protection of the government contractor defense and the Complaint should be dismissed.

### B.   Alternatively, The Court Should Dismiss This Action Pursuant to Fed. R. Civ. P. 12(b)(7) and 19(b) For Failure To Join A Required Party.

KGP's suit also should also be dismissed because KGP has not joined DRMS, the real source of KGP's grievances and a required party under Rule 19 of the Federal Rules of Civil Procedure.  Mandatory joinder analysis under Rule 19 requires two steps.  A court first asks whether a person's presence in the action is required, and if so, whether joinder of that person is feasible.  FED. R. CIV. P. 19(a)(1), (2).  If the person cannot be joined, the Court must next consider whether the case should go forward among existing parties, or be dismissed.  Fed. R. Civ. P. 19(b). "Rule 19 was designed to steer analysis away from the 'technical and abstract character[ization] of the rights or obligations of the persons whose joinder [is] in question,' and to direct attention instead to 'the pragmatic considerations which should be controlling.'" *Cloverleaf Standardbred Owners Ass'n, Inc. v. National Bank of Washington,* 699 F.2d 1274, 1277 (D.C. Cir. 1983) (quoting Advisory Committee Note, FED. R. CIV. P. 19 (1966)).

The practical considerations at play in this case demonstrate that DRMS's presence is required; however, DRMS cannot be joined because to do so would strip the Court of jurisdiction.  Because the case cannot fairly go forward in DRMS's absence and Plaintiff has an

alternate, more appropriate forum in which to seek justice, the Court should dismiss the case under Rules 12(b)(7) and 19.

### 1.     Joinder of DRMS is Required.

#### a.  The Court cannot provide complete relief to KGP and Defendants without DRMS.

A party's joinder is "required" under Rule 19 in either of two situations.  The first is when "in the person's absence[,] complete relief cannot be accorded among those already parties." FED. R. CIV. P. 19(a)(1)(A).  The "complete relief" criterion reflects policies of judicial economy and full disposition of the case.  *See* 4-19 MOORE'S FED. PRAC., § 19.03 (Rule 19 seeks "comprehensive resolution of disputes and avoidance of duplicative litigation"); Advisory Comm. Note, FED. R. 19(A) (1966) (complete relief clause reflects interests of "not only those of the parties, but also that of the public in avoiding repeated lawsuits on the same essential subject matter.").

If DRMS is not added as a defendant here, the objective of complete relief will not see fruition.  Again, this case springs from a dispute over the KGP-DRMS Contract -- a contract to which neither Defendant was even a party.  And the funds sought by KGP's Complaint have been remitted to DRMS pursuant to Modification No. 9, and currently reside in the U.S. Treasury. The Court therefore cannot provide complete relief to KGP and Defendants without DRMS in the case, because DRMS was and is ultimately responsible for KGP's payment - to the extent such payment is even due, and because DRMS allegedly ordered the involved services and actually possesses the funds at issue.  Were KGP to win a judgment against Defendants alone, Defendants would then have to proceed against DRMS.  In other words, the same basic controversy would be litigated twice, and the dispute resolved piecemeal.  *See Cloverleaf*, 699 F.2d at 1280 ("the courts and the public have a stake in settling disputes by wholes, whenever

possible") (quoting *Provident Bank,* 390 U.S. at 111) (internal quotations omitted).[12]  DRMS's

presence is required in order to ensure comprehensive disposition of the case.

> **b.  DRMS has an interest in CV2 Contract; and DRMS's absence
> from the case may impair its ability to protect that interest, and
> expose Defendants to a substantial risk of double obligations.**

Beyond its "complete relief" requirement, Rule 19 also mandates joinder of a person

when:

> that person claims an interest relating to the subject of the action
> and is so situated that the disposition of the action in the person's
> absence may
> (i) as a practical matter impair or impede the person's ability to
> protect that interest; or
> (ii) leave an existing party subject to a substantial risk of incurring
> double, multiple, or otherwise inconsistent obligations by reason of
> the interest.

FED. R. CIV. P. 19(a)(2)(B)

Both situations exist in this matter, once more because the dispute turns on the KGP-

DRMS Contract and because Defendants remitted the funds at issue to DRMS and such funds

reside in the U.S. Treasury.  First, any recovery by KGP likely would result in findings of fact or

legal conclusions relating to the KGP-DRMS Contract that would undermine the legal interest of

DRMS.  *See* 7 FED. PRAC. & PROC. § 1617 (3d ed. 2007) ("When an interest of the federal

government is involved in a suit and a judgment cannot be rendered without affecting that

---

[12]  DRMS is also a party to the CV2 Contract -- the agreement KGP invokes here as a third party.  Courts have joined contracting parties in cases where the rights and obligations under the contracts were disputed. *See Ward v. Deavers,* 203 F.2d 72, 76 (D.C. Cir. 1953) ("There is a general rule that where rights sued upon arise from a contract[,] all parties to it must be joined."); *see also, e.g., Global v. Discount Travel Svs., LLC v. Trans World Airlines, Inc.,* 960 F.Supp. 701, 708 (S.D.N.Y. 1997) (stating that complete relief could not be accorded when the other party to a ticket sales agreement had not been joined as a plaintiff in company's contract and antitrust suit against airline; other party's rights encompassed "same essential subject matter" of dispute -- the ticket agreement); *Swerhun v. General Motors Corp.* 141 F.R.D. 342, 347-48 (M.D. Fla. 1992) (when plaintiff claimed to be third-party beneficiary of franchise agreement between manufacturer and car dealership, court held co-owners of car dealership to be necessary parties to plaintiff's action against auto manufacturer).

interest, the government must be made a party to the action."); *Cloverleaf,* 699 F.2d at 1279 ("All three Rule 19(a) concerns are implicated when the person whose obligation is centrally at issue is missing from the action.").  Indeed, it seems patently evident that DRMS had a reason for issuing Modification No. 9 - perhaps KGP breached the KGP-DRMS Contract, perhaps KGP owes DRMS money and DRMS has exercised its right of setoff, perhaps DRMS has determined the KGP-DRMS Contract unenforceable, perhaps the KGP-DRMS contract has expired, etc.  It hardly seems appropriate or logical to force Defendants to seek the basis for and then defend the actions of DRMS under a more than decade old contract to which Defendants were not even a party.  Moreover, were KGP to prevail in its actions against Defendants alone and obtain a money judgment, then Defendants would presumably be required to pay funds to KGP that Defendants already remitted to DRMS -- a double liability relating to the same funds that would be avoided if DRMS were joined.

### 2.    Joinder of DRMS is not Feasible.

Yet DRMS cannot be joined to this action without bringing this case within the exclusive jurisdiction of the United States Court of Federal Claims.  *See* Fed. R. Civ. P. 19(a)(1) (requiring joinder of persons "whose joinder will not deprive the court of subject-matter jurisdiction[.]").  Joining DRMS would transform KGP's lawsuit into a contract action against both Defendants and the United States, seeking damages of approximately $1,500,000.  Compl. ¶¶ 103, 113.  Such actions involving the Government are within the sole jurisdiction of the United States Court of Federal Claims.  28 U.S.C. §§ 1346, 1491(a)(1)-(2) (divesting district courts of jurisdiction over contract claims against the United States where the amount in controversy exceeds $10,000); *Grasso v. United States Postal Serv.,* 438 F.Supp. 1231, 1235-36

(D. Conn. 1977) (dismissing plaintiff's district court action where non-tort claims came within Tucker Act's exclusive jurisdiction).

### 3.    The Case Cannot Properly Proceed Without DRMS and Dismissal Is Therefore Required.

Because DRMS's joinder is not feasible, the Court must ask whether, in equity and good conscience, the case should go forward between KGP and Defendants only, or should instead be dismissed pursuant to Rules 12(b)(7) and 19(b).  Rule 19(b) identifies several factors that bear on the issue:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
>
> (2) the extent to which any prejudice could be lessened or avoided by:
>
>> (A) protective provisions in the judgment;
>>
>> (B) shaping the relief; or
>>
>> (C) other measures;
>
> (3) whether a judgment rendered in the other person's absence would be adequate; and
>
> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. Rule Civ. P. 19(b).[13]

Application of the criteria of Rule 19(b) requires dismissal here for the reasons outlined above.  Indeed, allowing this case to move forward will unfairly prejudice *both* DRMS and Defendants.  As to Defendants, mounting a defense will require Defendants to first understand

---

[13]  These factors reflect four general interests:  (1) the plaintiff's interest in having a forum; (2) the defendant's interest in avoiding inconsistent relief or multiple litigation; (3) the interest of the absent party in protecting his rights; and (4) the interest in complete, consistent and efficacious settlement of the controversy.  *Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102 (1968).  All four policy concerns favor dismissal here, for the reasons noted earlier in this section.

and then defend the conduct of DRMS under a decade old KGP-DRMS Contract. As mentioned above, DRMS likely had reasons for issuing Modification No. 9 to the CV2 Contract and it is fundamentally unfair for Defendants to bear the burden of defending a DRMS decision. As to the United States, its inability to defend its conduct as a party defendant will likewise cause it prejudice as undersigned counsel has no obligation to advance issues that do not serve the interests of Defendants. If KGP prevails in this action, DRMS seems certain to be prejudiced by any factual or legal findings that this Court renders regarding KGP's right to payment under the KGP-DRMS Contract and KGP's standing under the CV2 Contract. It also bears note that any money judgment obtained by KGP against Defendants would be fundamentally unfair, as Defendants have transmitted the involved funds to DRMS and the funds currently reside in the U.S. Treasury.

By contrast, KGP would suffer no prejudice by dismissal of this action because the KGP lawsuit could simply proceed against DRMS in an alternate federal forum, the Court of Federal Claims -- where Defendants believe the matter should have been filed originally, without imposing upon the time and resources of this Court. The real party in interest to KGP's allegations is DRMS: the controversy relates to the terms of payment under the KGP-DRMS Contract, to which Defendants were not a party. Indeed, even under the strained pleading advanced by Plaintiff, the CV2 Contract under which Plaintiff bogusly claims third party beneficiary status serves as nothing more than a payment vehicle for the earlier KGP-DRMS Contract - a contract which may not entitle KGP to the amounts it claims.

The Court, accordingly, should dismiss Plaintiff's action for failure to join an indispensable party.

## IV.    CONCLUSION

For the reasons set forth herein, Defendants Surplus Acquisition Venture, LLC and Government Liquidation.Com, LLC respectfully request that this Court grant their motion to dismiss pursuant to Rule 12(b)(6) and dismiss this action with prejudice.  In the alternative, Defendants respectfully request that this Court grant their motion to dismiss pursuant to Rule 19(b) and dismiss this action without prejudice.

Defendants request that the Court hear oral argument on this Motion.

Respectfully submitted,

ARNOLD & PORTER LLP

/s/ Craig Holman
Craig A. Holman (Bar No. 447852)
Matthew D. Michael (Bar No. 477432)
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202
Phone:  (202)-942-5000
Fax:  (202) 942-5999

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of March, 2008, I caused a true and accurate copy of the foregoing pleading to be served by electronic delivery on counsel of record listed below:

Kenneth B. Weckstein
Howard A. Wolf-Rodda
601 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005
Attorneys for Plaintiff

/s/ Craig Holman
Craig A. Holman
Counsel for Defendants

**EXHIBIT A**

**COMPLAINT**

## SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | |
|---|---|
| KORMENDI\GARDNER PARTNERS,<br><br>Plaintiff,<br><br>v.<br><br>SURPLUS ACQUISITION VENTURE, LLC<br>2131 K Street, N.W.<br>Washington, D.C. 20037, and<br><br>GOVERNMENT LIQUIDATION.COM, LLC<br>2131 K Street, N.W.<br>Washington, D.C. 20037<br><br>Defendants. | Civil Action No.:<br>Calendar # |

JAN 2 3 2008

C00056-08

## COMPLAINT FOR BREACH OF CONTRACT,
## QUANTUM MERUIT AND ACCOUNTING

Plaintiff KORMENDI\GARDNER PARTNERS ("KGP") by its attorneys, Epstein Becker & Green, P.C., sues defendants SURPLUS ACQUISITION VENTURE, LLC ("SAV") and GOVERNMENT LIQUIDATION.COM, LLC ("GL") (collectively the "Defendants") seeking damages for breach of a contract under which the Defendants owed duties to KGP in its capacity as a third party beneficiary. KGP also seeks compensation in quantum meruit for the value of services rendered. KGP further demands an accounting of all revenues received by the Defendants for the transactions at issue in this action. In support of its complaint, KGP states:

### Introduction

1.      KGP sues SAV and GL to enforce its rights as a third party beneficiary of a contract between the Defendants and the Defense Reutilization and Marketing Service ("DRMS").

2.    KGP provided valuable financial advisory services to DRMS that led to a contract between the Defendants and DRMS, and substantial payments to Defendants.

3.    Defendants and DRMS, for valuable consideration, agreed that Defendants would compensate KGP for the work performed by KGP.

4.    The Defendants have failed to make payments owed to KGP as payment for its services.

5.    KGP seeks the compensation Defendants promised to pay KGP. Alternatively, KGP seeks compensation in quantum meruit for the value of the services rendered by it from which the Defendants derived significant benefits.  KGP further requests the Court to order a full accounting of all revenues received by the Defendants for the transactions at issue in this action.

**The Parties and Jurisdiction**

6.    Plaintiff KGP is a general partnership organized under the laws of the state of Delaware.  KGP maintains its principal place of business in the District of Columbia.

7.    Defendants SAV and GL are each, on information and belief, limited liability companies organized under the laws of the State of Delaware.  On further information and belief, GL is a wholly-owned subsidiary of SAV both of which are, themselves, wholly-owned subsidiaries of Liquidity Services, Inc. ("LSI"), a corporation organized under the laws of the State of Delaware.

8.    Defendant SAV, on information and belief, maintains its principal place of business in the District of Columbia at 2131 K Street, N.W., Washington, D.C.

- 2 -

20037. Defendant GL, on information and belief, maintains its principal place of business in the District of Columbia at 2131 K Street, N.W., Washington, D.C. 20037.

9.    The contract that is the subject of this action was to be performed in the District of Columbia.

10.    This Court has jurisdiction over the parties and the subject matter at issue in this action.

### DRMS and the KGP CV Financial Advisory Services Contract

11.    DRMS is a primary field activity of the Defense Logistics Agency, which, in turn, is an agency of the United States Department of Defense. DRMS maintains offices and engages in operations nationwide and overseas.

12.    As part of its mission, DRMS engages in transactions for the disposition of U.S. Government owned personal property turned into DRMS for disposition. Among these, DRMS has entered into relationships with private firms in which the companies purchase designated property from DRMS and resell the property in the private market ("Property Transactions"). DRMS, however, retains an interest in the Property Transactions insofar as the contract governing the relationships determines how the private company and DRMS shall allocate the proceeds from the purchase and resale of the property.

13.    These relationships variously are referred to as "retained interest transactions," "Ventures," "Commercial Ventures," or "CVs."

14.    To assist it in forming such Commercial Ventures, DRMS awarded a contract (Contract No. SP4410-97-C-1000) (the "KGP CV Financial Advisory Contract") to KGP to provide financial advisory services to DRMS.

- 3 -

15. Originally awarded on December 18, 1996, the period of performance for the KGP CV Financial Advisory Contract continued through September 6, 2002.

16. KGP entered into the KGP CV Financial Advisory Contract with DRMS in the District of Columbia, and KGP performed all services under the contract in the District of Columbia for the entire period of performance.

17. Under the contract, KGP assisted DRMS in the formulation and implementation of methods to employ the private sector for selling excess Department of Defense ("DoD") property. KGP's work specifically supported DRMS's efforts to design and implement CV transactions.

18. The KGP CV Financial Advisory Contract provided that, other than reimbursement of pre-approved out-of-pocket expenses, KGP would not be paid by DRMS.

19. Instead, KGP was to be compensated for its services by receiving a percentage of the net proceeds received from Property Transactions during the existence of the CV.

20. On information and belief, KGP's work during the existence of the CVs at issue in this case has resulted in DRMS receiving net proceeds in excess of two hundred million dollars.

21. On information and belief, KGP's work during the existence of the CVs at issue in this case has resulted in the Defendants receiving revenues in excess of forty million dollars.

22.     Under the KGP CV Financial Advisory Contract, payments were to be made to KGP by the contractors engaged by DRMS to participate in the CVs.

### The Commercial Venture Program

23.     The "CV Program," as conceived by KGP for DRMS, provided for the award of a contract to a contractor that would be entitled to purchase property from DRMS and then resell the property on the open market.

24.     The CV Program provided that, instead of paying the entire purchase price for the property to DRMS, the contractor was to split the payment of the purchase price into two portions. One portion was to be paid to DRMS and the other portion was to be paid to KGP (according to contractually determined percentages). Likewise, upon the reselling of CV Property on the open market, the contractor was to pay DRMS and KGP contractually determined percentages of the net proceeds from resale transactions instead of paying DRMS the entire net proceeds from resale transactions.

25.     Based on the services provided by KGP, DRMS launched active implementation of the first Commercial Venture ("CV1") on July 14, 1998 when it awarded a 5-year contract (the "CV1 Contract) to Levy/Latham, LLC pursuant to DRMS Invitation for Bids ("IFB") No. 99-7005 dated April 1998 (Levy/Latham, LLC later was renamed SurplusBid.com, Inc.; for ease of reference, the entity shall be referred to as "SB" throughout this complaint).

26.     As part of its obligations under the CV1 contract, SB formed a special purpose entity, known as Levy Latham Global, LLC ("LLG"), which was designated as the "Purchaser" as that term was used in the CV1 Contract.

27.    DRMS identified 312 classes of property for disposition under the CV1 Contract (the "CV1 Property"). The CV1 Contract provided that LLG would purchase inventories of CV1 Property identified from time-to-time by DRMS for disposition.

28.    The purchase price for each collection of CV1 Property would be stated in an invoice from DRMS.

29.    According to the terms of the CV1 Contract, LLG was required to pay 97.75% of the purchase price of the CV Property to DRMS.

30.    The CV1 Contract further required LLG to pay 2.25% of the purchase price of the CV Property to KGP.

31.    Once it had purchased a collection of CV1 Property, LLG was authorized to offer the property for resale to prospective buyers. To the extent that LLG resold CV1 Property, LLG would collect funds from the resale buyers.

32.    The CV1 Contract provided that the funds collected from the resale buyers first would be used to pay LLG's costs associated with selling CV1 Property. The remaining sale proceeds (the "Net CV Proceeds") were to be distributed by LLG by payments made to SB, DRMS, and KGP ("CV Distribution Payments").

33.    Specifically, the CV1 Contract directed LLG to make CV Distribution Payments to KGP equal to 1.8% of Net CV Proceeds.

34.    Using the services provided by KGP, DRMS later entered into a second commercial venture program ("CV2"), which resulted in the award of a seven year contract to defendant SAV on June 13, 2001 (the "CV2 Contract") and provided for the disposition of an additional 342 classes of DoD property (the "CV2 Property").

- 6 -

35.    As SB did under the CV1 program, SAV set up a single purpose entity, Defendant GL, to fulfill the role of "Purchaser" under the CV2 Contract.

36.    While initiation of the CV2 transaction was pending, SAV entered into an asset purchase agreement on April 19, 2001 in which defendant SAV purchased both SB and LLG. Having done so, SAV assumed the obligations of those predecessor companies for the CV1 Contract.

37.    On June 15, 2001, DRMS and SAV agreed to a contract modification that incorporated the CV1 Property classes into the CV2 Contract thereby consolidating the two programs under the CV2 Contract (hereafter, the CV1 Property and the CV2 Property shall collectively be referred to as "CV2 Property").

38.    The CV2 Contract adopts transactional and financial arrangements substantially similar to those of the CV1 Contract. The CV2 Contract provides that GL will purchase inventories of CV2 Property identified from time-to-time by DRMS for disposition. The purchase price for each of these inventories of CV2 Property will be stated in an invoice from DRMS. The CV2 Contract requires GL to pay 97.75% of the purchase price of the CV2 Property to DRMS.

39.    The CV2 Contract requires GL to pay 2.25% of the purchase price of the CV2 Property to KGP.

40.    The duty to pay KGP a portion of the purchase price for the CV2 Property is stated in the CV2 Contract in Article 5, Section 2(B):

> **(B)    Amounts Payable to DRMS and to KGP; Timing of Payments**
>
> Each Invoice shall identify (i) an amount (the "DRMS Invoiced Amount") equal to ninety-seven and seventy-five one-hundredths percent (97.75%) of the Total Invoiced Amount, and (ii) **an amount (the "KGP Invoiced Amount")**

**equal to two and twenty-five one-hundredths percent (2.25%) of the Total Invoiced Amount. Purchaser** [Defendant GL] **shall pay** to DRMS and **to KGP** the full amounts of the DRMS Invoiced Amount and **the KGP Invoiced Amount**, respectively, on or before the date that is fifteen (15) Days after each Invoice is submitted to Purchaser. [Emphasis added.]

41.    Once GL purchases CV2 Property, the CV2 contract authorizes GL to resell the property. To the extent GL resells the property, the CV2 Contract provides that GL first shall pay its costs of reselling the property. The CV2 Contract then requires GL to issue monthly CV Distribution Payments of the Net CV Proceeds to SAV, DRMS and KGP.

42.    The CV2 Contract specifically requires GL to make monthly CV Distribution Payments to KGP equal to 1.8% of Net CV Proceeds.

43.    The CV2 Contract entitled SAV to receive 20% of the Net CV Proceeds with the remainder to be paid to DRMS.

44.    The requirement to make CV Distribution Payments to KGP is described in Article 16, section 4 of the CV2 Contract, which states:

**Section 4. Distribution Payments.**

**Purchaser shall make payments of Distributions** (each, a "Distribution Payment") **to** DRMS, **KGP** and Contractor contemporaneously in accordance with the following provisions within fifteen (15) Days after the last Day of each calendar month that is in whole or in part within the Performance Period and Wind-Up: [ . . . ]. [Emphasis added.]

45.    GL and SAV are both obligated to perform all duties owed under the CV2 Contract. *See* Article 1, Section 10.

46.    As co-obligors, the Defendants jointly are required to pay KGP its share of the purchase price for property acquired from DRMS for resale. Defendants

- 8 -

further are required to make monthly CV Distribution Payments to KGP in an amount equal to the percentage of the Net CV Proceeds designated by the CV2 Contract for payment to KGP.

47.     Defendants are obligated to continue making payments to KGP in accordance with the terms of the CV2 Contract for the full duration of the CV2 Contract with DRMS.

48.     Article 2, Section 1 of the CV2 Contract states that "referrals" of property shall continue for 84 months following the first referral of property for disposition under the CV2 Contract (such period being the "Performance Period").

49.     DRMS first referred property under the CV2 Contract on June 19, 2001.

50.     The Performance Period for acceptance of referrals of property by the Defendants thus is scheduled to continue until June 18, 2008.

51.     Additionally, the Defendants are obliged to continue performing their obligations to resell property and to make CV Distribution Payments for an indefinite period (the "Wind-up") following the end of the performance period.  This indefinite period continues until, among other requirements, (a) all property is resold, (b) all invoices and Distributions are paid to DRMS and KGP, (c) a "Closing Report" is delivered to KGP and DRMS, (d) bank accounts are closed, and (e) GL concludes its legal existence.  Article 22.

### The Scrap Venture Program

52.     After significant time had passed since inception of the CV Program, DRMS initiated a parallel surplus property disposition effort known as the

"Scrap Venture" ("SV"), which now is being performed by the Defendants' corporate parent, LSI, pursuant to a contract that was awarded to LSI on or about June 30, 2005 (the "SV Contract").

53.    The transactional structure to implement the scrap disposition effort (the "SV Program") was developed by KGP and resembled the CV Program in most respects.

54.    For example, the SV Program, like the CV Program, required the SV Contractor to create an entity to serve as the SV Purchaser, which would purchase the scrap material from DRMS.  The SV Purchaser was required to pay the purchase price to DRMS and KGP according to contractually specified percentages (specifically, 97.75% to DRMS and 2.25% to KGP).

55.    The SV Purchaser then would offer the scrap material for resale to the general public.

56.    The revenue from the resale of the scrap material would first be used by the SV Purchaser to reimburse itself for the costs it incurred in preparing and offering the scrap material for resale.

57.    The remaining proceeds (the "Net SV Proceeds") would be distributed to the SV Contractor (i.e., LSI), DRMS and KGP in contractually determined percentages (the payments of the Net SV Proceeds shall be referred to as "SV Distribution Payments").

58.    Like the CV2 Contract, the SV Contract obligated the SV Purchaser to pay KGP 1.8% of the Net SV Proceeds.

59.     Like the CV2 Contract, the SV Contract entitled the SV Contractor, LSI, to 20% of the Net SV Proceeds with the remainder to be paid to DRMS.

60.     Having awarded the SV Contract to the corporate parent of SAV and GL, DRMS authorized the sharing of operating expenses for both the CV2 and SV Contracts in a manner that was intended to reduce overall costs and thereby increase the Net CV Proceeds and Net SV Proceeds available for distribution to KGP, DRMS, and the contractors.

### Defendants' Cessation of CV Distribution Payments to KGP and Diminution of Net CV Proceeds

61.     KGP believes it received what it was due under the CV2 Contract until the summer of 2006. At that time, Defendants stopped making payments to KGP under the CV2 Contract. Defendants also agreed to modifications to the CV2 and SV Contracts, without the consent of KGP, that reduced the Net CV Proceeds from which the distributions to KGP would be calculated and paid.  Thus, the Defendants not only failed to make the payments owed to KGP, they also agreed to modifications that wrongfully reduced the amount of the payments that should have been made.

62.     Until no later than August 15, 2006, Defendant GL, in accordance with the requirements of the CV2 Contract, made monthly payments of KGP Invoiced Amounts and CV Distribution Payments to KGP with respect to property referred by DRMS to GL for sale.

63.     Specifically, from June 15, 2001 through August 11, 2006, GL paid KGP amounts equal to 2.25% of the total invoiced amount applicable to all property purchased under the CV2 program (*i.e.*, the portion of the initial purchase price of

property purchased by GL from DRMS that the CV2 Contract required GL to pay to KGP).

64.    Further, from June 15, 2001 through August 14, 2006, GL issued CV Distribution Payments to KGP in accordance with the terms of the CV2 Contract, *i.e.*, 1.8% of the Net CV Proceeds for all CV2 Property.

65.    Neither GL nor SAV has made invoice payments to KGP since August 11, 2006, for KGP's share of the purchase price payable for CV property acquired from DRMS.

66.    Neither GL nor SAV has made any CV Distribution Payments to KGP with respect to CV2 Property referred after August 15, 2006 by DRMS to GL for sale.

67.    Also, without notice to or consent of KGP, Defendants agreed to a modification of the CV2 Contract that substantially increased the costs that would be incurred by GL to perform the CV2 Contract. That modification substantially reduced the Net CV Proceeds available for CV Distribution Payments to KGP.

68.    Specifically, on or about September 12, 2006, Defendants and DRMS agreed to a modification of the CV2 Contract (known as "Supplemental Agreement No. 11," which shall be referred to as "Supp 11").

69.    KGP did not consent to the adoption of Supp 11.

70.    Supp 11 significantly broadened the scope of GL's responsibilities and services to require GL to develop and implement new inventory inspection and assurance procedures to minimize the release of property that is not to be sold to the public ("Controlled Property").

71.    Supp 11 acknowledged that these procedures, which were not within the scope of the CV Program at any stage of its development and implementation, would result in "opportunity costs and program management requirements not contemplated in the net proceeds sharing ratios under [the CV2 Contract]."

72.    Supp 11 also increased the Defendants' share of Net CV Proceeds under the CV2 Contract  from 20% to as much as 30.5%.

73.    Supp 11 substantially increased the costs of the CV2 Contract and reduced the Net CV Proceeds available for distribution to KGP.

74.    On or about June 1, 2007, LSI, the SV Purchaser and DRMS agreed to a contract modification under the SV Program, which increased the costs of performing the SV Contract.

75.    The modification further increased the share of Net SV Proceeds to be retained by LSI from 20% to 23%.

76.    KGP did not consent to this modification.

77.    On information and belief, the modification of the SV Contract further reduced the Net CV Proceeds because a portion of the costs of performing the SV Contract is charged to the CV2 Contract.

78.    The foregoing circumstances have led to a substantial reduction in the Net CV Proceeds, which, in turn, have reduced and are continuing to reduce the CV Distribution Payments that should have been but were not paid to KGP under the CV2 Contract.

### Count I – Breach of Contract

79.    KGP incorporates the allegations of paragraphs 1 through 78 by reference as if fully stated herein.

80.    KGP performed all services and fulfilled all conditions required of it under the KGP CV Financial Advisory Contract.

81.    KGP's compensation for the services performed by it under the KGP CV Financial Advisory Contract were to come from the proceeds of transactions under the CV1, CV2, and SV Contracts.

82.    The Defendants are parties to the CV2 Contract, (which, in addition to its own provisions, incorporated the requirements of the CV1 Contract).

83.    Under the CV2 Contract, DRMS agreed to identify property for purchase by Defendant GL.  Defendant GL agreed to purchase this property as consideration for its exclusive right to resell the property on the open market.

84.    The Defendants further agreed to pay KGP a portion of the purchase price for the CV2 Property.

85.    The Defendants further agreed to pay KGP a portion of the Net CV Proceeds obtained from the open market resale of the CV2 Property.

86.    The payments to be made to KGP were compensation for KGP's financial advisory services.

87.    KGP's financial advisory services conferred a benefit upon the Defendants by virtue of the fact that KGP developed and facilitated the CV relationship between the Defendants on one hand and DRMS on the other.

88.    Further, DRMS gave Defendants valuable consideration under the CV2 Contract.

89.    In exchange, DRMS required and Defendants agreed to make payments to KGP in accordance with the formulas specified in the CV2 Contract.

90.    When they entered into the CV2 Contract, Defendants SAV and GL agreed that they jointly would compensate KGP in accordance with the formulas specified in the CV2 Contract.

91.    Specifically, the CV2 Contract expressly required the Defendants, in accordance with CV2 Contract Article 5, Section 2(B), to pay KGP amounts equal to the "KGP Invoiced Amount" within 15 days following the issuance of an invoice by DRMS.

92.    The CV2 Contract further expressly required the Defendants to pay KGP amounts equal to KGP's share of CV Distribution Payments "within fifteen (15) Days after the last Day of each calendar month that is in whole or in part within the Performance Period and Wind-Up . . ." in accordance with CV2 Contract Article 16, Section 4.

93.    After August 15, 2006, the Defendants ceased making payments with respect to property referred by DRMS to GL for purchase thereafter.

94.    Defendants ceased making these payments required under the CV2 Contract in spite of the facts that the CV2 Contract remains in force, that GL continues to purchase property from DRMS, that Defendants continue to derive Net CV Proceeds from selling such property, that the Performance Period has not come to an end, and that the Wind Up period has not commenced.

95.    In addition to the cessation of payments, the Defendants, without KGP's consent, have agreed to contract modifications to the CV2 Contract that have resulted in the reduction of Net CV Proceeds that should have been available for distribution to KGP after August 15, 2006.

96.    The CV2 Contract and the CV1 Contract both expressly stated that the Defendants were to pay KGP the KGP Invoiced Amount and KGP's CV Distribution Payments.

97.    DRMS, SAV and GL expressly intended for KGP to be a beneficiary of the CV2 Contract. Essentially, DRMS was obligated to compensate KGP; DRMS conferred benefits and rights on Defendants; and DRMS and Defendants agreed that Defendants would pay for the benefits and rights that Defendants received from DRMS by making direct payments to KGP.

98.    Accordingly, KGP is an express beneficiary of the Defendants' agreements under the CV2 Contract.

99.    By failing to make the promised payments, the Defendants have breached their obligations to KGP.

100.    By letter dated September 25, 2003, KGP notified SAV and GL that it relied upon and intended to enforce its rights as a third party beneficiary of the CV contracts.  KGP further stated that it did not consent to any modification to the CV contracts that would affect its rights.

101.    The Defendants have not sought and KGP has not granted consent in any manner to modify either the CV2 Contract or the SV Contract.

- 16 -

102.   KGP has incurred damages in the amount of the payments that should have been paid to KGP but were not paid by the Defendants. KGP is continuing to incur damages equal to the amount of each payment payable under the CV2 Contract that is not being paid as and when it becomes due.

103.   Under the CV2 Contract, Defendants should have been paying KGP at least $100,000 each month since September 2006. Accordingly, KGP's damages at this time are at least $ 1,500,000 (for the September 2006 to January 2008 time frame), exclusive of interest and any other expenses.

104.   In addition, as a consequence of the increased costs and reduced Net CV Proceeds resulting from the Defendants' agreement to modify the CV2 and SV Contracts without obtaining KGP's consent, KGP's damages exceed the amount alleged in the preceding paragraph.

**WHEREFORE**, KGP demands judgment against Defendants SAV and GL in the amount of $ 1,500,000 plus such other damages that are proven in a trial of this matter, plus interest and costs to the extent allowable at law, and such other relief that the Court determines is just and proper.

### Count II – Quantum Meruit

105.   KGP incorporates the allegations of paragraphs 1 through 78 by reference as if fully stated herein.

106.   KGP, by virtue of providing financial advisory services to facilitate the disposition of CV Property, provided valuable services both to DRMS and to the Defendants. Further, the valuable consideration that Defendants received from DRMS

under the CV2 Contract was the result of services rendered by KGP for which Defendants agreed to make payment to KGP.

107.   The Defendants received a valuable benefit from the services provided by KGP and knew that such services were to be paid for out of proceeds from the disposition of CV Property.

108.   These services included the formulation and implementation of the CV programs and the facilitation of the relationship between DRMS, SAV and GL.

109.   The Defendants used and enjoyed the services provided by KGP by virtue of their entering into valuable CV transactions with DRMS, specifically the CV2 Contract and the CV1 Contract incorporated therein.

110.   KGP's services were rendered under such circumstances that reasonably notified the Defendants that KGP expected to be paid for its services out of the proceeds of the CV transactions.  In fact, KGP repeatedly has informed the Defendants that they have failed to compensate KGP for the services provided to the Defendants and DRMS.

111.   On information and belief, for the period from September  2006 to January 2008, KGP's services to Defendants have produced revenues to Defendants in excess of fifteen million dollars.

112.   But for the provision of services by KGP, DRMS would not have entered into the arrangement that it did for the sale of CV2 Property and the Defendants would not have received any revenues from such sales.

113.   The value of the services provided by KGP that have not been compensated by Defendants exceed $ 1,500,000.

**WHEREFORE**, KGP demands judgment against Defendants SAV and GL in the amount of $ 1,500,000 plus such other damages that are proven in a trial of this matter, plus interest and costs to the extent allowable at law, and such other relief that the Court determines is just and proper.

### Count III – Accounting

114. KGP incorporates the allegations of paragraphs 1 through 78 by reference as if fully stated herein.

115. The CV2 Contract at Article Eight, Sections 5(C), 5(D) and 5(E), and at Article 16, Section 1, requires GL, in its capacity as "Purchaser," to prepare and submit monthly, quarterly, annual, and closing reports to DRMS and KGP providing, among other data, income statements, balance sheets, statements of cash flows, notes to financial statements, inventory status and disposition reports, a detail and summary of distributions, working capital advances, purchase advances and purchase transfers.

116. SAV and GL have failed and continue to fail to provide to KGP the reports required by the provisions of the CV2 Contract.

117. The CV2 Contract requires that the Defendants' books and records be maintained in accordance with Generally Accepted Accounting Principles.

118. In the absence of such records, KGP has been deprived of an accounting of the proceeds to which it is entitled under the CV2 Contract.

**WHEREFORE**, KGP demands an order of the Court appointing a special master to review the records of SAV and GL and prepare an accounting of the proceeds owed to KGP under the CV2 Contract, or directing Defendants to prepare such

accounting and reports required under the terms of the CV2 Contract, certify that the

accounting is true and correct, and provide the certified accounting and records to KGP.

### JURY DEMAND

Plaintiff hereby demands a jury trial of this action for all issues so triable.

Respectfully submitted,

**EPSTEIN BECKER & GREEN, P.C.**

Kenneth B. Weckstein
District of Columbia Bar No. 239301
kweckstein@ebglaw.com

Howard A. Wolf-Rodda
District of Columbia Bar No. 449377
hwolf-rodda@ebglaw.com

1227 25th Street, N.W.
Washington, D.C. 20037
(202) 861-0900 (voice)
(202) 296-2882 (facsimile)

DATED: January 23, 2008

FROM: Anna Stewart (302)658-7581
CT - Wilmington SOP Team
1209 Orange Street

Wilmington, DE 19801

TO   **Cheryl  Ryan (480)609-3272**
**Government Liquidation.com, LLC**
**15051 N. Kierland Boulevard**
**Suite 300**
**Scottsdale, AZ 85254**
Ref: SOP/0503900/513100191/Anna Stewart

FedEx Revenue Barcode

CAD#: 8278170
SHIP DATE: 19FEB08
WEIGHT: 1 LB

DELIVERY ADDRESS (FedEx-EDR)

** 2DAY **

TRK #  7910 0285 0047       FORM
0201

85254    -AZ-US



PHX

# SA ZSYA

**THU**
A2
Deliver by:
21FEB08

CLS120707

# EXHIBIT B

# EXCERPTS FROM CV2 CONTRACT

# (Additional Provisions Provided As Part Of

# Notice of Removal)



# SURPLUS COMMERCIAL PROPERTY

## DEFENSE REUTILIZATION AND MARKETING SERVICE

### INVITATION FOR BIDS
### NO. 99-0001

### STEP TWO OF TWO - STEP SOLICITATION

### DECEMBER 2000
### (Updated March 2001 to include Amendments 8-14)

## SURPLUS COMMERCIAL PROPERTY
## INVITATION FOR BIDS
### No. 99-0001

### TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | STEP TWO OF TWO-STEP SEALED BIDDING | 1 |
| II. | GENERAL STATEMENTS OF CONTRACT TERMS | 2 |
| | A. INTRODUCTION | 2 |
| | B. PRODUCT POOL AND PROPERTY FLOW | 3 |
| | C. DESIGNATION OF SCRAP VS. USEABLE ITEMS | 5 |
| | D. PHASE-IN PERIOD AND PERFORMANCE PERIOD | 6 |
| | E. PURCHASER AND CONTRACTOR RESPONSIBILITIES | 7 |
| | F. BID PERCENTAGES AND CONTRACTOR'S PURCHASE PRICE | 7 |
| | G. POTENTIAL REFERRAL OF CV-1 ITEMS | 8 |
| | H. BIDDER DUE DILIGENCE | 8 |
| | I. NET PROCEEDS AND DIRECT COSTS | 8 |
| | J. SELLER INDIRECT COSTS | 9 |
| | K. OPERATING ACCOUNT AND DISTRIBUTIONS | 11 |
| | L. WORKING CAPITAL ADVANCES AND REPAYMENTS | 11 |
| | M. DISTRIBUTIONS AND PAYMENTS | 11 |
| | N. EARLY CANCELLATION OPTION | 12 |
| | O. PURCHASE ACCOUNT | 12 |
| | P. PAYMENT DEPOSIT | 12 |
| | Q. RETENTION FUND AND FINANCIAL GUARANTEE BOND | 13 |
| | R. ABSENCE OF DRMS PRE-APPROVALS, AUTHORIZATIONS AND OPERATIONAL CONTROL | 14 |
| | S. COMPLIANCE MONITORING AND DISPUTE RESOLUTION | 14 |
| | T. DELIVERY POINTS | 15 |
| | U. LOGISTICS | 17 |
| | V. DEMIL B AND Q PROPERTY | 18 |
| | W. THE FIRST TWO YEARS OF OPERATIONS OF CV-1 | 20 |
| | X. MISCELLANEOUS | 21 |
| | Y. SCRAP RATE RISK AND ADJUSTMENTS TO CONTRACTOR'S PURCHASE PRICE | 23 |
| | Z. RISK FACTORS | 24 |
| III. | BID SCHEDULE | 28 |
| | A. BACKGROUND INFORMATION | 28 |
| | B. BID PROCESS | 29 |
| | C. ILLUSTRATION OF THE DETERMINATION OF THE WINNING BID | 32 |
| | D. ILLUSTRATIVE FINANCIAL MODEL | 33 |
| IV. | ITEM DESCRIPTION | 34 |

V.    TERMS AND CONDITIONS OF SALE ................................................35
VI.   ADDITIONAL TERMS AND CONDITIONS OF SALE ...................36
      ARTICLE ONE.  BIDDING AND CONTRACT AWARD ...............36
            Section 1.  Bid Deposit. ...........................................................36
            Section 2.  Bid Evaluation. .....................................................36
            Section 3.  Contract Award. ...................................................36
            Section 4.  Post-Award Conference. ......................................36
            Section 5.  Purchaser Information. .........................................37
            Section 6.  Formation of Purchaser; Covenant of Contractor. ......37
            (A)    Formation of Purchaser. ...............................................37
            (B)    Covenant of Contractor. ...............................................37
            Section 7.  Transfer and Hypothecation. ...............................37
            (A)    General Prohibition. .....................................................37
            (B)    Attempted Transfer. .....................................................38
            (C)    Consolidation with CV-1. ............................................38
            Section 8.  Contract of Sale. ..................................................38
            (A)    Relationship of Parties. ..............................................38
            (B)    Parties to Contract. .....................................................38
            Section 9.  Authority of Sales Contracting Officer. ..............38
            Section 10.  Execution by Purchaser. ....................................38
            Section 11.  Replacement Contractor. ...................................39
            Section 12.  Referral of CV-1 Property. ................................39
            (A)    Termination or Cancellation of CV-1. ........................39
            (B)    Expiration of CV-1. .....................................................39
            (C)    CV-1 Property Referral Date. .....................................39
            Section 13.  Non-DRMS Assets .............................................39
      ARTICLE TWO.  PERFORMANCE PERIOD; EARLY CANCELLATION
            OPTION ...........................................................................40
            Section 1.  Performance Period. ............................................40
            Section 2.  Early Cancellation Option. ..................................40
      ARTICLE THREE.  R/T/D REVIEW; REFERRAL AND REMOVAL OR
            ABANDONMENT OF PROPERTY; RCP AND SPECIAL SITUATION
            PROPERTY; TITLE TO PROPERTY; RISK OF LOSS ................41
            Section 1.  R/T/D Review; Property Referral List .................41
            (A)    R/T/D Review. ............................................................41
            (B)    Property Referral List. ...............................................41
            Section 2.  Delivery Points; DRMS Customer Liaison; Phase-In ........41
            Period; DRMS Infrastructure Reduction. ...............................41
            (A)    Delivery Points. ..........................................................41
            (B)    Delivery Point Directory; DRMS Customer Liaison. ...........42
            (C)    Phase-In Period. ..........................................................42
      Table VI.3.2.C ...........................................................................43
            (D)    DRMS Infrastructure. .................................................43

- iii -

(E)     Maximum Number of DRMOs and DRMS Warehouses. ....................44
Section 3. R/T/D of the Property; Property Storage; Delivery of Property to
      Purchaser and Passage of Title. .......................................44
(A)     R/T/D of the Property. .......................................................44
(B)     Property Storage. ...............................................................44
(C)     Transfer to Purchaser of Control Over and Title to the Property. ......45
Section 4. Access to Property; Removal; On-Site Processing; Costs of
      Removal. ...............................................................................46
(A)     Purchaser's Access to Property. ..........................................46
(B)     Re-Sale Buyers' Access to Property. ...................................47
(C)     Removal; Packing and Loading. ..........................................47
(D)     On-Site Processing. ...........................................................48
(E)     DRMS Option to Permit On-Site Processing. .....................48
(F)     Costs of Removal. ..............................................................49
(G)     Base Closures. ..................................................................49
(H)     Damage to Government Property; Clean-Ups of Spills. ......49
Section 5. Title. .................................................................................50
Section 6. Abandonment. ..................................................................50
Section 7. Risk of Loss. .....................................................................50
Section 8. Initial Property Referral List. .............................................50
Section 9. Initial Removal of Property. ...............................................51
ARTICLE FOUR. PROPERTY REFERRAL LIST ...............................51
Section 1. Access to R/T/D Inventory in Process. ...............................51
Section 2. Property Referral List. ......................................................51
Section 3. Documentation and References. .........................................53
ARTICLE FIVE. PAYMENT BY PURCHASER FOR PROPERTY ........53
Section 1. Payment Deposit. ..............................................................53
Section 2. Payment by Purchaser for Property. ...................................53
(A)     Invoices and Payments. .....................................................53
(B)     Amounts Payable to DRMS and to KGP; Timing of Payments. ..........53
(C)     Failure to Make Timely Payments. .....................................53
(D)     Payments. ..........................................................................54
ARTICLE SIX. QUANTITY DELIVERABLE; DISCREPANCIES AND ANNUAL
      PRICING CORRECTION; SCRAP ...............................................55
Section 1. Sale by Reference Conditions. ...........................................55
Section 2. Discrepancies. ...................................................................55
Section 3. Items with Excessive Acquisition Value. ............................56
Section 4. Items not Available for Removal; Return of Compressed Gas
      Cylinders. ..............................................................................56
Section 5. ADP Equipment. ...............................................................56
Section 6. Scrap. ...............................................................................56
(A)     Downgrades Upon Receipt. ................................................56
(B)     Upgrades. ...........................................................................57

ARTICLE SEVEN.  OPERATIONS ...................................................................58
   Section 1.  Compliance with Applicable Law and Regulations. .......................58
    (A)    Compliance with Applicable Law. ...............................................58
    (B)    Licenses and Permits. ...................................................................58
    (C)    Responsibility for Keys. ...............................................................58
   Section 2. Duties of Care and Loyalty. .............................................................59
    (A)    Duty of Care. ................................................................................59
    (B)    Duty of Loyalty. ............................................................................59
   Section 3.  Prohibited Activities. ......................................................................59
   Section 4.  Classified and Other Material. ........................................................60
   Section 5.  Munitions List Items and Commerce Control List Items...............60
    (A)    Acknowledgment of Export Restrictions. ...................................60
    (B)    Purchaser's TSC Clearance and End Use Certificate. .................61
    (C)    Re-Sale Procedures. .....................................................................61
    (D)    Compliance With EUC Requirements. .........................................61
    (E)    Shipping Containers .....................................................................61
    (F)    Compliance With New Trade Security Control Requirements ...........61
   Section 6.  Employee Compensation. ...............................................................62
    (A)    Base Compensation. .....................................................................62
    (B)    Bonuses. ........................................................................................62
   Section 7.  Employee Expenses and Purchaser's Supplies, Furniture and
            Equipment. ....................................................................................62
    (A)    Employee Expenses. ....................................................................62
    (B)    Supplies, Furniture and Equipment. ...........................................62
   Section 8.  RCP Batch Lots. ..............................................................................62
   Section 9.  Vehicles Requiring Mutilation ........................................................63
   Section 10.  Airworthiness Certification ...........................................................63
   Section 11.  Commerce Control List Items (CCLI) ..........................................63
   Section 12.  Munitions And Commerce Control List Item Compliance ...........64
   Section 13.  Y2K Calendar Sensitive (Year 2000) Equipment.........................64
   Section 14.  Flight Safety and Critical Aircraft Parts (FSCAP) ......................64
   Section 15.  Resource Conservation and Recovery Act Notice ........................65
   Section 16.  Chemical Agent Resistant Coating (CARC) Paint .......................65
   Section 17.  Refrigerant ....................................................................................66
   Section 18.  Warranty for Useable Aircraft Components/Parts........................66
   Section 19.  Medical Device Item .....................................................................66
   Section 20.  Aircraft Insignia and Markings ....................................................66
   Section 21.  Helicopter Blades and Tail Rotors ...............................................66
   Section 22.  Kitchen Stoves...............................................................................67
   Section 23.  Compressed Gas Cylinders............................................................67
    (A)    Handling .......................................................................................67
    (B)    Record Maintenance .....................................................................67
    (C)    Purchaser Liability .......................................................................67

(D)      Pre-Award Survey ...................................................68

(E)      Statement of Intent. ..............................................63

ARTICLE EIGHT.  PURCHASER'S RECORDS; INSPECTION AND AUDIT BY
        GOVERNMENT AND INDEPENDENT AUDITOR; ACCOUNTING
        PRINCIPLES AND REQUIRED REPORTS TO GOVERNMENT ............68

    Section 1.  Contractor Records Retention. .....................................68

    Section 2.  Inspection of Records and Workplace by Government. ................68

    Section 3.  Records Maintenance. ..............................................69

    Section 4.  Contracts with Third Parties. .....................................69

    Section 5.  Purchaser's Books of Account; Financial Reports. ..................69

    (A)      Transition Report. ........................................69

    (B)      Monthly Report. ...........................................70

    (C)      Quarterly Report. .........................................70

    (D)      Annual Report. ............................................71

    (E)      Closing Report. ...........................................71

    (F)      Reporting Schedule. .......................................72

ARTICLE NINE.  DIRECT COSTS ..........................................72

    Section 1.  Definitions. ..............................................72

    (A)      Direct Costs. .............................................72

    (B)      Seller Indirect Costs. ....................................72

    (C)      Contractor Indirect Costs. ................................73

    Section 2.  Documentation and Payment of Direct Costs and Seller Indirect
             Costs. ....................................................73

    (A)      Disbursements. ............................................73

    (B)      Supporting Documentation. .................................73

    (C)      Documentation Requirements. ...............................73

    (D)      Payment. ..................................................73

    (E)      Written Certification to DRMS. ............................73

    (F)      Contractor Indirect Costs. ................................73

ARTICLE TEN.  CONFLICTS OF INTEREST ..................................74

    Section 1.  Restriction on Participation. .....................................74

    Section 2.  Benefits to Contractor and Affiliated Parties. ....................74

ARTICLE ELEVEN.  FIDELITY BOND REQUIREMENTS; INSURANCE ..........74

    Section 1.  Modification of Special Circumstance Conditions. ..................74

    Section 2.  Further Modifications. ............................................74

ARTICLE TWELVE.  SOFTWARE AND SYSTEMS ...............................75

    Section 1.  Identification of Systems and Software Developed with Contractor
             Funds. ....................................................75

    Section 2.  License in Contractor Systems and Software. .......................76

    Section 3.  Systems and Software Developed with Purchaser Funds. ..............76

    Section 4.  Third-Party Software. .............................................78

    Section 5.  Software Documentation and Maintenance. ...........................78

ARTICLE THIRTEEN.  OPERATING ACCOUNT; WORKING CAPITAL ........79

Section 1.  Operating Account. ...................................................79
(A)      Establishment. ............................................................79
(B)      Maintenance of Sufficient Funds. ...............................79
Section 2.  Working Capital. ....................................................79
Section 3.  Funds in the Operating Account; Treatment of Interest. .............79
Section 4.  Working Capital Advances. .....................................79
Section 5.  Limited Right to Borrow Funds. ..............................79
Section 6.  Deposits to Operating Account. ...............................80
(A)      Receipts. ....................................................................80
(B)      Working Capital Advances. ......................................80
(C)      Contractor's Responsibility for Funds. ......................80
Section 7.  Disbursements from Operating Account. ..................80
(A)      Costs Payable from Operating Account. .....................80
(B)      Limitation on Disbursements. ....................................80
(C)      Signatures. .................................................................80
Section 8.  Transfer Accounts. .................................................80
ARTICLE FOURTEEN.  PURCHASE ACCOUNT ....................81
Section 1.  Purchase Account. ..................................................81
(A)      Establishment. ............................................................81
(B)      Maintenance of Sufficient Funds ...............................81
Section 2.  Purchase Advances. ................................................81
Section 3.  Funds in the Purchase Account; Treatment of Interest. .............81
Section 4.  Treatment of Purchase Advances. ...........................81
Section 5.  Disbursements from Purchase Account. ...................81
Section 6.  Purchase Transfers. ................................................81
ARTICLE FIFTEEN.  FINANCIAL GUARANTEE BOND; RETENTION FUND;
        ESTIMATED CONTINGENT LIABILITIES RESERVE ....................82
Section 1.  Election of Contractor to Provide Financial Guarantee Bond in
        Lieu of Retention. ........................................................82
Section 2.  Financial Guarantee Bond. .....................................82
Section 3.  Retention Fund. ......................................................82
(A)      Establishment of Retention; Retention Rate; Retention Fund;
        Required Retention Fund Balance. ..............................82
(B)      Insolvency of Contractor. ..........................................83
(C)      Increased Retention. ..................................................83
(D)      Release of Retention Fund. ........................................83
Section 4.  Estimated Contingent Liabilities Reserve. ...............83
ARTICLE SIXTEEN.  DISTRIBUTIONS ..................................84
Section 1.  Monthly Distribution Statement. .............................84
Section 2.  Calculate Cash Available for Distribution and Operating Net
        Worth. .........................................................................84
(A)      Calculate Cash Available for Distribution. .................84
(B)      Calculate Operating Net Worth. .................................84

- vii -

Section 3. Calculate Net Worth Allocations. ......................................84
(A)    Calculate Contractor Net Worth Allocation. ......................84
(B)    Calculate DRMS Net Worth Allocation.............................84
(C)    Calculate KGP Net Worth Allocation. ...............................85
Section 4. Distribution Payments..........................................................85
ARTICLE SEVENTEEN.  COMPLIANCE AND MONITORING......................87
Section 1. Purpose and Content of Compliance Reviews and Further
         Reviews. ..............................................................................87
(A)    Compliance Reviews and Further Reviews. .......................87
(B)    Methods. ................................................................................87
Section 2. Procedures for Compliance Reviews. .................................87
(A)    Procedures and Notice. ........................................................87
(B)    Scope. .....................................................................................87
Section 3. Further Reviews....................................................................88
Section 4. Compliance Notification. .....................................................88
Section 5. Costs of Oversight.................................................................88
ARTICLE EIGHTEEN.  AUDIT ADJUSTMENTS .......................................88
Section 1. Notice of Audit Adjustment..................................................88
Section 2. Procedures for Adjudication of Audit Adjustments. ........88
Section 3. Remedies for Audit Adjustments. .......................................88
ARTICLE NINETEEN.  MATERIAL BREACH ...........................................89
Section 1. Notice of Material Breach.....................................................89
Section 2. Response to Notice.................................................................89
(A)    Cure. .......................................................................................89
(B)    Submission of Dispute to Dispute Resolution Panel. ...........89
Section 3. Termination............................................................................89
Section 4. Intentional Breach.................................................................89
Section 5. DRMS Remedies for Material Breach by Contractor or
         Purchaser. ...........................................................................90
Section 6. Indemnification of DRMS by Contractor and Purchaser. ..........90
Section 7. Indemnification of Contractor by DRMS. ..........................90
ARTICLE TWENTY.  DISPUTE RESOLUTION ..........................................90
Section 1. Selection of Dispute Resolution Panel.................................90
(A)    Appointment of Arbitrators..................................................90
(B)    Service of Arbitrators. ..........................................................91
(C)    Expenses..................................................................................91
Section 2. Location and Governing Rules..............................................91
Section 3. Jurisdiction of the Panel. ......................................................91
(A)    Matters Committed to the Panel...........................................91
(B)    Availability of Judicial Relief...............................................91
Section 4. Submission of Disputes to the Panel. ..................................91
(A)    Dispute. ...................................................................................91
(B)    Process.....................................................................................92

Section 5.  Decision..................................................................................92
Section 6.  Remedies Available to Dispute Resolution Panel. ........................93
(A)     Remedies in the Case of Disputes. ...............................................93
(B)     Remedies for Ineligible Disbursements.........................................93
(C)     Award of Costs. ............................................................................93
Section 7.  Effective Date. ...........................................................................93
Section 8.  Agreement to Use Alternative Dispute Resolution ......................93
ARTICLE TWENTY-ONE.  WIND-UP OF PURCHASER ...............................93
Section 1.  Wind-Up Commencement Date. .................................................93
Section 2.  Cessation of Property Referrals. ................................................94
Section 3.  Conduct of Wind-Up. ................................................................94
Section 4.  Submission and Approval of Closing Report...............................94
(A)     Preparation by Contractor.............................................................94
(B)     Preparation by DRMS....................................................................94
Section 5.  Final Distributions; Refund of Remaining Balance of Payment
            Deposit and Remaining Balance of Retention Fund..................94
(A)     Final Distributions; Dissolution of Purchaser...............................94
(B)     Refund of Payment Deposit and Retention Fund. .........................95
(C)     Early Refund of Retention Fund. ...................................................95
ARTICLE TWENTY-TWO.  MISCELLANEOUS PROVISIONS .....................95
Section 1.  Binding Effect. ...........................................................................95
Section 2.  Notices.......................................................................................95
Section 3.  Severability; Consolidation with CV-1 .......................................97
Section 4.  Headings. ...................................................................................97
Section 5.  Survival. ....................................................................................97
Section 6.  Waiver. ......................................................................................97
Section 7.  Force Majeure............................................................................97
Section 8.  Use of DRMS Name; Public Communications. ...........................98
Section 9.  Tense and Gender.......................................................................98
Section 10.  Entire Agreement; Modification. ...............................................98
Section 11.  Computation of Time. ...............................................................98
Section 12.  Electronic Communication. .......................................................98
ARTICLE TWENTY-THREE.  DEFINITIONS AND CROSS-REFERENCES TO
            DEFINITIONS .....................................................................98
VII.    ATTACHMENTS AND SCHEDULES ...........................................105
VIII.   ATTACHMENT VI.2.2.B ..............................................................110

**Section 5.  Purchaser Information.**

Within thirty (30) Days of the date of award, Contractor shall provide the following to DRMS (collectively, the "Purchaser Information"), and Purchaser shall provide to DRMS updated Purchaser Information within ten (10) Days of any change thereto:

      **(A)**    Notice to DRMS of Purchaser's complete legal name, type of business organization (corporation or limited liability company), place of formation (i.e., Delaware), Federal Employer Identification Number, and principal place of business.

      **(B)**    Copies to DRMS of all documents evidencing: **(i)** Purchaser's legal formation and internal governance; **(ii)** if Purchaser is a corporation, Purchaser's election of Subchapter S status for federal income tax purposes; and **(iii)** appointment of Purchaser's Registered Agent.

      **(C)**    Notice to DRMS of Purchaser's Operating Account and Purchase Account, including the name, address and telephone contact information of the bank(s) of deposit, account numbers, and identification of the signatories on the accounts.

      **(D)**    Copies of all documents evidencing the opening of the Operating and Purchase Accounts, including without limitation copies of the signature card(s), resolutions and instructions to the bank.

      **(E)**    Notice to DRMS of the designation of Key Persons, if any, in addition to those identified in Contractor's technical proposal.  Two (2) Key Persons, including Purchaser's Chief Executive Officer, are required pursuant to the provisions of Article 13 to authorize certain payments and transfers from the Operating Account.

**Section 6.  Formation of Purchaser; Covenant of Contractor.**

      **(A)**    **Formation of Purchaser.**

Upon award of the contract to Contractor, Contractor shall cause the formation of a single purpose Subchapter S corporation or limited liability company (the "Purchaser"), over which Contractor shall retain control and in which Contractor shall retain at least a majority (51%) ownership interest throughout the Performance Period and until completion of the Wind-up, to perform the contract as provided herein.

      **(B)**    **Covenant of Contractor.**

Contractor hereby covenants and agrees that, from and after the date of award and until completion of the Wind-Up, Purchaser will remain a single purpose Subchapter S corporation or limited liability company, the sole purpose of which is to perform this contract, and which will not form or acquire any subsidiary business entity.

**Section 7.  Transfer and Hypothecation.**

      **(A)**    **General Prohibition.**

Except as specifically provided herein or specifically approved by DRMS in writing, neither Purchaser nor Contractor may directly or indirectly sell, transfer, assign, pledge, offer as collateral or otherwise hypothecate all or any part of its rights or obligations under the contract, or, with respect to Contractor, its ownership interest in Purchaser, provided, however, that (i) Contractor may convey or hypothecate a portion of its ownership interest in Purchaser if, after such conveyance, or after transfer in accordance with such hypothecation, Contractor retains control over and a majority (51%) ownership interest in Purchaser; and (ii) hypothecation of

37

Contractor's distribution payments for the sole purpose of obtaining financing necessary to perform the contract shall not be deemed violative of the provisions of this Article and (iii) such sale, transfer, assignment or hypothecation is not to any individual or firm that is suspended, debarred or otherwise prohibited from participation in government contracts. For purposes of the general prohibition set forth in this Section 7(A), the sale, transfer or hypothecation by Contractor of any voting stock of any corporation that directly or indirectly owns any interest in Purchaser or of any partnership interest in any general or limited partnership that directly or indirectly owns any interest in Purchaser shall constitute an assignment or transfer of an interest in Purchaser within the meaning of this Section 7(A).

(B)    **Attempted Transfer.**

Any attempted transfer in violation of the provisions of this Article shall be null and void, ab initio, and shall constitute a Material Breach of this contract.

(C)    **Consolidation with CV-1.**

In the event that the CV-1 and CV-2 Contractors propose consolidation of the CV-1 and CV-2 sale contracts or operations, in whole or in part, DRMS shall not unreasonably condition, withhold or delay its approval.

### Section 8.  Contract of Sale.

(A)    **Relationship of Parties.**

This contract is an agreement for the proceeds-sharing sale of the Property by DRMS as seller to Purchaser as buyer.  Contractor and DRMS expressly disavow the creation of any other relationship, including without limitation principal-agent, master-servant, employer-employee, general or limited partnership, or joint venture, between DRMS and either Contractor or Purchaser.

(B)    **Parties to Contract.**

The parties to this contract are DRMS, Contractor and, pursuant to the provisions of Section 10 of this Article 1, Purchaser.  The exclusive representative of DRMS for all purposes under this contract is the SCO, and all notices, demands, requests, consents, approvals, declarations, reports and other communications to DRMS from Contractor or Purchaser shall be deemed ineffective unless addressed to the SCO and delivered in compliance with the provisions of Article 22, Section 2.  Kormendi\Gardner Partners ("KGP") is the DRMS Financial Advisor. KGP is neither a party to the contract nor an agent of DRMS for any purpose.  Communications from Contractor or Purchaser to KGP shall not be deemed received by DRMS unless provided to DRMS in compliance with the provisions of Article 22, Section 2.

### Section 9.  Authority of Sales Contracting Officer.

The SCO has the authority on behalf of DRMS **(i)** with respect to matters committed by the provisions of this contract to the exercise of DRMS's sole discretion, to exercise such discretion, **(ii)** with respect to all matters hereunder, to represent DRMS and to commit DRMS to take such actions as are permitted or required hereunder, and **(iii)** to extend or waive timing requirements or deadlines as may reasonably be required under the circumstances.

### Section 10.  Execution by Purchaser.

Within thirty (30) Days of the date of award, Contractor shall cause Purchaser's Chief Executive Officer to execute on behalf of Purchaser and deliver to DRMS the Confirmation of

Purchaser as Co-Signatory and Co-Obligor, the form of which is attached as Attachment VI.1.9. Notwithstanding the failure to deliver or delay in delivering such properly executed document to DRMS, Purchaser shall be deemed to be a co-signatory and co-obligor with Contractor with respect to this contract effective from the date of award and Purchaser and Contractor shall be jointly and severally liable for the performance of their respective obligations under this contract.

### Section 11.  Replacement Contractor.

In the event of a Termination of the original Contractor within sixty (60) Days of the date of award, the SCO may award the contract to the next highest bidder that is determined by the SCO to be responsible if bids have not expired, and such award is otherwise determined to be in the Government's best interest, price and other factors considered.

### Section 12.  Referral of CV-1 Property.

**(A)      Termination or Cancellation of CV-1.**

If referrals of CV-1 Items by DRMS for sale to the CV-1 buyer end due to exercise of the early cancellation option in the CV-1 contract or due to termination by DRMS by reason of a default by the CV-1 buyer, DRMS may elect in the exercise of its sole discretion to refer the CV-1 Items for sale to Purchaser pursuant to the provisions of this contract, and Purchaser shall be required to purchase such items as provided herein.  DRMS shall provide written notice of such election to Purchaser.

**(B)      Expiration of CV-1.**

If referrals of CV-1 items by DRMS for sale to the CV-1 buyer end other than by reason of cancellation or termination for default, DRMS shall thereafter refer the CV-1 Items for sale to Purchaser pursuant to the provisions of this contract, and Purchaser shall be required to purchase such items as provided herein.  DRMS shall provide written notice thereof to Purchaser.

**(C)      CV-1 Property Referral Date.**

The date upon which the initial Property Referral List that includes CV-1 Items shall be issued to Purchaser (the "CV-1 Property Referral Date") shall be the date that is thirty (30) Days following the date of the DRMS notice to Purchaser that is required by the provisions of this Section 12(C) provided, however, that DRMS and Purchaser may agree to any other date. Subject to the early cancellation option provisions of Section 2 of Article 2, referrals of CV-1 Items by DRMS for sale to Purchaser shall continue thereafter throughout the Performance Period.

### Section 13.  Non-DRMS Assets

Periodically, DRMS sells non-excess items.  Title to these items remains with the military service until the sale is complete.  As such, these items are not entered on DRMS's inventory and are not automatically included on this sale contract.  Notwithstanding, DRMS may choose, with Purchaser's agreement, to sell these items to the Purchaser on a case-by-case basis. As the Government's share of the net revenue from the sale of these items is payable through DRMS to the owning military service, all reasonably segregable costs and revenues must be discretely accounted for and reported to DRMS as agreed by the parties.  The sale of such items shall be governed by the provisions hereof pertaining to Property referral, storage, removal, billing, payments and related matters except as otherwise required by DRMS and agreed by Purchaser.

    **(O)**    **Hazardous Material Code**. This one (1) character field contains an "M" or a "W" if the corresponding item is deemed to be, or to be contaminated by, hazardous material or hazardous waste, respectively. With the exception of FSC 8120 (Commercial and Industrial Gas Cylinders), the Property does not include any "M" items. Without exception, the Property does not include any "W" items.

    **(P)**    **DEMIL Code.** This one (1) character field contains "A," "B" or "Q."

### Section 3. Documentation and References.

DRMS shall provide training, documentation, manuals and references as reasonably requested by Purchaser to allow Purchaser to determine the meaning of coded information.

## ARTICLE FIVE. PAYMENT BY PURCHASER FOR PROPERTY

### Section 1. Payment Deposit.

Within ten (10) Days of the date of award, Contractor shall pay to DRMS the amount of four-hundred thousand dollars ($400,000.00) (the "Pre-Payment"). The Pre-Payment must be made via guaranteed instrument (cashier's or certified check), wire transfer or electronic funds transfer (EFT). The Government shall hold Contractor's Bid Deposit and this Pre-Payment (collectively, the "Payment Deposit") until the completion of the Wind-Up and will use the Payment Deposit to offset unpaid billings or to offset any other claims by DRMS against Contractor or Purchaser. The Government shall return any available balance of the Payment Deposit, without interest thereon, to Contractor at the completion of the Wind-Up as provided in Article 21.

### Section 2. Payment by Purchaser for Property.

    **(A)**    **Invoices and Payments.**

DRMS shall periodically submit to Purchaser in machine readable, comma delimited ASCII file format, delivered on a removable magnetic or optical storage medium, such as a CD-ROM, a billing ("Invoice") for payment for the Property referred for sale to Purchaser since the last preceding Invoice. The Invoice shall be in the total amount of the Contractor's Purchase Price of the subject Property, determined by multiplying the Acquisition Value of each Line Item by the corresponding Bid Percentage for the applicable FSC, less any credits to which the Purchaser is entitled (the balance being the "Total Invoiced Amount").

    **(B)**    **Amounts Payable to DRMS and to KGP; Timing of Payments.**

Each Invoice shall identify **(i)** an amount (the "DRMS Invoiced Amount") equal to ninety-seven and seventy-five one-hundredths percent (97.75%) of the Total Invoiced Amount, and **(ii)** an amount (the "KGP Invoiced Amount") equal to two and twenty-five one-hundredths percent (2.25%) of the Total Invoiced Amount. Purchaser shall pay to DRMS and to KGP the full amounts of the DRMS Invoiced Amount and the KGP Invoiced Amount, respectively, on or before the date that is fifteen (15) Days after each Invoice is submitted to Purchaser.

    **(C)**    **Failure to Make Timely Payments.**

With respect to any particular Invoice, should Purchaser fail to pay to DRMS and to KGP the full amounts of the DRMS Invoiced Amount and the KGP Invoiced Amount, respectively, on or before the date that such payments are due, DRMS may, in its sole discretion, **(i)** apply that portion of the Payment Deposit that is necessary to pay the Total Invoiced Amount, in which

53

event DRMS shall pay to KGP the subject KGP Invoiced Amount, and **(ii)** notify Purchaser that such failure constitutes a Material Breach that Purchaser may cure within ten (10) Days of service of notice thereof by paying to DRMS an amount equal to one-hundred twenty percent (120%) of the subject Total Invoiced Amount, which payment shall be applied by DRMS to replenish and increase the amount of the Payment Deposit.

   **(D)**  **Payments.**

  Unless otherwise provided by notice, all payments to DRMS and to KGP shall be made and delivered pursuant to the following instructions, which instructions may be changed by written notice to Purchaser.

     **(1)**  **Instructions for Payments to DRMS.**  DRMS prefers payment be made via EFT; however, payments may also be made via wire transfer, guaranteed instrument (certified or cashier's check) made payable to U.S. Treasury.  EFT and wire transfer should be made to the following account:

     Mellon Bank
     043000261
     Account # 9101019

     Include in the addendum field of the EFT the following information:

     DRMS #99-0001
     Type of payment (i.e. Pre-payment, Invoice payment or other)

     A separate EFT transaction must be processed for each type of payment.

     DRMS-RP ATTN: Cashier
     74 N. Washington Ave.
     Battle Creek, MI  49017-3092

    **(2)**  **Instructions for Payments to KGP.**
     By:  Wire transfer
     [KGP to provide details after award]

liabilities and obligations of Purchaser have been satisfied, it being expressly understood that DRMS may submit to the Dispute Resolution Panel in accordance with the provisions of Article 20 a Dispute as to the appropriate duration or amount of the ECLR. So long as Purchaser maintains the ECLR on its books, it shall include within its Monthly, Quarterly and Annual Reports a written statement (the "ECLR Statement") of the amount of the ECLR and an itemization specifying the contingent, conditional and unmatured claims and obligations of Purchaser that the ECLR is intended to satisfy.

## ARTICLE SIXTEEN. DISTRIBUTIONS

### Section 1. Monthly Distribution Statement.

Within fifteen (15) Days after the last Day of each calendar month that is in whole or in part within the Performance Period and Wind-Up, Purchaser shall prepare and submit to DRMS, KGP and Contractor the "Monthly Distribution Statement" with respect to such month in the form specified at Attachment VI.16.1. Purchaser shall perform the following calculations in preparing the Monthly Distribution Statement. Except as otherwise provided herein, all amounts shall be determined as of the close of business on the last Day of the subject month.

### Section 2. Calculate Cash Available for Distribution and Operating Net Worth.
#### (A)    Calculate Cash Available for Distribution.

Purchaser shall calculate the amount of Purchaser's "Cash Available for Distribution," equal to **(x)** the sum of the cash balances in the Operating Account and the Transfer Accounts (Purchaser's "Operating Cash Balance") <u>minus</u> **(y)** the sum of **(i)** the Working Capital Advance Balance, **(ii)** the amount of Purchaser Liabilities, **(iii)** Purchaser's reasonable estimate of the amount of cash required for the payment of Direct Costs for the next succeeding calendar month, **(iv)** Purchaser's reasonable estimate of the amount of cash required for the payment of Seller Indirect Costs during the next succeeding calendar month, and **(v)** the Estimated Contingent Liability Reserve (ECLR).

#### (B)    Calculate Operating Net Worth.

**(1) Cash Available for Distribution is Less Than or Equal to Zero.** If Cash Available for Distribution is less than or equal to zero, the amount of Purchaser's "Operating Net Worth" shall equal the amount of Seller Indirect Costs paid during the subject month.

**(2) Cash Available for Distribution is Greater Than Zero.** If Cash Available for Distribution is greater than zero, the amount of Purchaser's "Operating Net Worth" shall equal **(x)** the Cash Available for Distribution <u>plus</u> **(y)** the amount of Seller Indirect Costs paid during the subject month.

### Section 3. Calculate Net Worth Allocations.
#### (A)    Calculate Contractor Net Worth Allocation.

Purchaser shall calculate the amount of the "Contractor Net Worth Allocation" as Operating Net Worth <u>multiplied by</u> twenty percent (20.00%).

#### (B)    Calculate DRMS Net Worth Allocation.

Purchaser shall calculate the amount of the "DRMS Net Worth Allocation" as Operating Net Worth <u>multiplied by</u> seventy-eight and twenty one-hundredths percent (78.20%).

**(C)    Calculate KGP Net Worth Allocation.**
Purchaser shall calculate the amount of the "KGP Net Worth Allocation" as Operating Net Worth multiplied by one and eighty one-hundredths percent (1.80%).

**Section 4. Distribution Payments.**
Purchaser shall make payments of Distributions (each, a "Distribution Payment") to DRMS, KGP and Contractor contemporaneously in accordance with the following provisions within fifteen (15) Days after the last Day of each calendar month that is in whole or in part within the Performance Period and Wind-Up:

**(A)**    As of the inception of the contract, the "Net Worth Allocation Balance" for DRMS, Contractor and KGP, respectively, shall be deemed equal to zero.

**(B)    DRMS Net Worth Allocation is Greater Than or Equal to the Sum of Seller Indirect Costs and DRMS Net Worth Allocation Balance.**
If the DRMS Net Worth Allocation is greater than or equal to the sum of Seller Indirect Costs paid during the subject month and DRMS Net Worth Allocation Balance for the preceding calendar month, Purchaser shall calculate the amounts of the Distribution Payments and the Net Worth Allocation Balances for the subject month as follows.

**(1)  Calculate Contractor Distribution Payment and Contractor Net Worth Allocation Balance.**
**(a)**    Purchaser shall calculate the amount, of the "Contractor Distribution Payment" as the amount of **(i)** the Contractor Net Worth Allocation, plus  **(ii)** the preceding calendar month's Contractor Net Worth Allocation Balance.
**(b)**    The Contractor Net Worth Allocation Balance for the subject month shall equal zero.

**(2)  Calculate DRMS Distribution Payment and DRMS Net Worth Allocation Balance.**
**(a)**    Purchaser shall calculate the amount, of the "DRMS Distribution Payment" as the amount of **(i)** the DRMS Net Worth Allocation, minus  **(ii)** the preceding calendar month's DRMS Net Worth Allocation Balance, minus  **(iii)** Seller Indirect Costs paid during the subject month.
**(b)**    The DRMS Net Worth Allocation Balance for the subject month shall equal zero.

**(3)  Calculate KGP Distribution Payment and KGP Net Worth Allocation Balance.**
**(a)**    Purchaser shall calculate the amount, of the "KGP Distribution Payment" as the amount of **(i)** the KGP Net Worth Allocation, plus  **(ii)** the preceding calendar month's KGP Net Worth Allocation Balance.
**(b)**    The KGP Net Worth Allocation Balance for the subject month shall equal zero.

**(C)    DRMS Net Worth Allocation is Less Than the Sum of Seller Indirect Costs and DRMS Net Worth Allocation Balance.**

If the DRMS Net Worth Allocation is less than the sum of Seller Indirect Costs paid during the subject month and DRMS Net Worth Allocation Balance for the preceding calendar month, Purchaser shall calculate the amounts of Distribution Payments and Net Worth Allocation Balances as follows.

**(1)  Calculate Contractor Distribution Payment and Contractor Net Worth Allocation Balance.**

**a.**    Purchaser shall calculate the amount of the "Contractor Distribution Payment" as the amount of **(i)** ninety-one and seventy-four one-hundredths percent (91.74%), underlined multiplied by **(ii)** Cash Available for Distribution, provided, however, that the Contractor Distribution Payment shall not be less than zero.

**b.**    Purchaser shall calculate the amount of the "Contractor Net Worth Allocation Balance" as the amount of **(i)** the Contractor Net Worth Allocation, plus **(ii)** the Contractor Net Worth Allocation Balance for the preceding calendar month, minus **(iii)** the Contractor Distribution Payment.

**(2)  Calculate DRMS Distribution Payment and DRMS Net Worth Allocation Balance.**

**a.**    The amount of the "DRMS Distribution Payment" shall equal zero.

**b.**    Purchaser shall calculate the amount of the "DRMS Net Worth Allocation Balance" as the amount of **(i)** the DRMS Net Worth Allocation Balance for the preceding calendar month, minus **(ii)** the DRMS Net Worth Allocation, plus **(iii)** Seller Indirect Costs paid during the subject month.

**(3)  Calculate KGP Distribution Payment and KGP Net Worth Allocation Balance.**

**a.**    Purchaser shall calculate the amount of the "KGP Distribution Payment" as eight and twenty-six one-hundredths percent (8.26%) of the Cash Available for Distribution, provided, however, that the KGP Distribution Payment shall not be less than zero.

**b.**    Purchaser shall calculate the amount of the "KGP Net Worth Allocation Balance" as the amount of **(i)** the KGP Net Worth Allocation, plus **(ii)** the KGP Net Worth Allocation Balance for the preceding calendar month, minus **(iii)** the KGP Distribution Payment.

**(D)    Adjustments to Distributions.**

**(1)**  Purchaser shall deduct from the DRMS Distribution Payment and add to the Contractor Distribution Payment the amount of any credit for overpayments of Invoices owed by DRMS as required by the provisions hereof, provided, however, that the balance payable to DRMS shall not be less than zero.

**(2)**  Any amount that Contractor owes to Purchaser as the result of an undisputed Audit Adjustment, a Decision of the Dispute Resolution Panel, a final judgment or other undisputed obligation in an amount certain, shall be deducted from the Contractor Distribution Payment, provided, however, that the balance payable to Contractor shall not be less than zero.

86

**(5) Documentation and Payment Provided to DRMS.** Provide to DRMS and to KGP copies of all documents evidencing compliance with the provisions of this Article 21 and payment of any Distribution Payments owed to DRMS under Article 16.

**(B)    Refund of Payment Deposit and Retention Fund.**

Upon receipt by DRMS and KGP of all amounts payable thereto and all documentation to be provided pursuant to the provisions hereof, DRMS shall pay to Contractor the remaining balances, if any, of the Payment Deposit and Retention Fund without interest.

**(C)    Early Refund of Retention Fund.**

Contractor may obtain payment from DRMS of the balance in the Retention Fund without interest at any time before conclusion of the Wind-Up by providing a Financial Guarantee Bond in the amount of one million dollars ($1,000,000.00) that is issued for the remaining Performance Period through the conclusion of the Wind-Up, and that is otherwise acceptable to DRMS in the exercise of its sole discretion.

## ARTICLE TWENTY-TWO. MISCELLANEOUS PROVISIONS

### Section 1. Binding Effect.

Subject to the restrictions on transfers and encumbrances set forth herein, this contract shall inure to the benefit of and be binding upon DRMS, Contractor and Purchaser, and their respective legal representatives, successors and assigns. Whenever this contract refers to any party, such reference shall be deemed to include a reference to the legal representatives, successors and assigns of such party.

### Section 2. Notices.

All notices, demands, requests, consents, approvals, declarations, reports and other communications required hereunder shall be in writing except as otherwise provided herein and addressed as follows, and the same shall be given and shall be deemed to have been served and given if (**i**) delivered in person, (**ii**) delivered by registered or certified U.S. mail, return receipt requested, postage prepaid, (**iii**) deposited into the custody of Federal Express Corporation or other reputable overnight carrier ("Overnight Carrier") for next Business Day delivery, (**iv**) telecopied, or (**iv**) electronically transmitted:

If to DRMS:

　　　　Tina Aldrich
　　　　Sales Contracting Officer
　　　　DRMS-LMU
　　　　74 North Washington Avenue
　　　　Battle Creek, Michigan  49017
　　　　Telecopy No.  (616) 961-5668

approval, declaration or other communication to a party or to any persons designated above to receive a copy thereof shall in no way adversely affect the effectiveness of such notice, demand, request, consent, approval, declaration or other communication.

### Section 3.  Severability; Consolidation with CV-1

(A)    If any provision of this contract or the application thereof to any Person or circumstance shall be invalid or unenforceable to any extent, the remainder of this contract and the application of such provisions to other Persons or circumstances shall not be affected thereby, and the intent of this contract shall be enforced to the greatest extent permitted by law, provided, however, that, if any of the provisions of Article 5, Section 1 ("Payment Deposit") or the application thereof to any Person or circumstance shall be determined in a final judgment rendered by a court or other tribunal of competent jurisdiction to be invalid or unenforceable to any extent, DRMS may in the exercise of its sole discretion cause Termination by notice served within thirty (30) days of the date upon which such judgment becomes final, such Termination to be effective five (5) Days after the date of service of such notice.

(B)    In the event that the CV-1 and CV-2 transactions or operations are consolidated in whole or in part, the provisions of this CV-2 IFB shall supersede any conflicting provisions of the CV-1 contract.

### Section 4.  Headings.

The headings appearing in this contract are inserted only as a matter of convenience and in no way define, limit, construe or describe the scope or intent of any article or section of this contract.

### Section 5.  Survival.

The rights and obligations of the parties under this contract shall survive for a period of six (6) years after the completion of the Wind-Up.

### Section 6.  Waiver.

No consent or waiver, express or implied, by any party to or of any breach or default by any other party in the performance by such other party of its obligations under this contract shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligations of such other party under this contract.  Failure on the part of any party to complain of any act or failure to act by any of the other parties or to declare any of the other parties in default, regardless of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

### Section 7.  Force Majeure.

The parties shall be excused for the period of any delay in the performance of any obligations under this contract when prevented from performing such obligations by cause or causes beyond their reasonable control, including, without limitation, civil commotion, war, invasion, rebellion, hostilities, military or usurped power, sabotage, pestilence, riots, fire or other casualty or acts of God.

### Section 8.  Use of DRMS Name; Public Communications.

Neither Contractor nor Purchaser shall use the name of DRMS or its logos for any marketing or other purposes without the express prior written consent of DRMS, which consent may be withheld for any reason whatsoever and is subject to the sole discretion of DRMS. Neither Contractor nor Purchaser shall publicly denigrate the surplus property disposition program of the U.S. Department of Defense or the conduct thereof by DRMS.

### Section 9.  Tense and Gender.

Unless the context clearly indicates otherwise, the singular shall include the plural and vice versa.  Whenever the masculine, feminine or neuter gender is used inappropriately in this contract, this contract shall be read as if the appropriate gender had been used.

### Section 10.  Entire Agreement; Modification.

This contract, and the materials incorporated herein by reference, constitute the entire agreement between the parties regarding the matters contained in this contract.  If there is any inconsistency between the terms of this contract and those of any Appendix, Schedule or Exhibit hereto, the terms of this contract shall govern.  There are no promises or other agreements, oral or written, express or implied, between the parties other than as set forth in this contract.  No change or modification of, or waiver or compromise under, this contract shall be valid unless it is in writing and signed by a duly authorized representative of the party against which it is to be enforced.  Contractor understands and agrees to submit a written request for contract modification to the SCO prior to effecting any change from that stated in its technical proposal (including any subcontractors identified therein), and/or Sale of Government Property-Item Bid Page, whether occurring before or after the release of the Property.  Contractor further agrees not to effect such changes without first receiving the written approval of the SCO.

### Section 11.  Computation of Time.

In computing any period of time prescribed or allowed by this contract, the Day of the act, event, or default from which the designated period of time begins to run shall not be included.  The last Day of the period so computed shall be included unless it is not a Business Day, in which event the period runs until the end of the next Business Day.

### Section 12.  Electronic Communication.

DRMS and Purchaser shall cooperate to facilitate delivery of Property Referral Lists, Invoices and Purchaser's Reports to the extent reasonably practical by electronic transmission, such as by electronic mail or file transfer, rather than by delivery of a physical removable magnetic or optical storage medium.

## ARTICLE TWENTY-THREE.  DEFINITIONS AND CROSS-REFERENCES TO DEFINITIONS

**AAA Rules:**  As defined in Article 20.

**Acquisition Value:**  With respect to each item of Property that is **(i)** identified by National Stock Number, the unit price of such item as it is recorded in the Federal Logistics Information System at the time that data concerning the turn-in of the Property are input into the

Defense Automated Information System, or **(ii)** identified by Local Stock Number, the original cost if available or the estimated replacement cost, as determined by the generator of such item and recorded on the corresponding turn-in document provided to DRMS by the generator. The Acquisition Value of a particular Line Item of Property is reported on the Property Referral List as "Acquisition Value Available," which is the product of "Quantity Available" (measured in the applicable unit of issue, e.g., each, box, dozen, etc.) multiplied by "Item Unit Price."

**Additional NSN Data:** As defined in Article 4.

**ADR:** As defined in Article 20.

**Affiliate Transaction:** Either **(i)** any sale by or on behalf of Purchaser of goods, assets, property or services to, or purchase by or on behalf of Purchaser of goods, assets, property or services from, an Affiliated Party, including, without limitation, the purchase or sale of, or of any interest in, any of the subject Property, or **(ii)** any transaction on behalf of Purchaser conditioned upon or involving any action or transaction entered into by any Affiliated Party, including, without limitation, a transaction that directly or indirectly benefits an Affiliated Party.

**Affiliated Party: (i)** Contractor or any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, Contractor or Purchaser; or **(ii)** any Person that is a director, officer, management official, employee, trustee or general partner of, or an owner of an equity interest of one percent (1%) or more or a beneficiary of a trust owning an equity interest of one percent (1%) or more in, Contractor or any other Person specified in clause (i) above; or **(iii)** any individual Person related by blood, marriage or guardianship within two (2) degrees of affinity to any individual Person specified in clauses (i) or (ii) above. For purposes of this definition, a Person shall be presumed to have control when such Person possesses the power, directly or indirectly, or has the power to direct, or cause the direction of, the management or policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. In addition, and without limiting the foregoing, an employee or subcontractor of Purchaser or Contractor shall be deemed to be an Affiliated Party if he, she or it derives fifty percent (50%) or more of its gross compensation or revenues in any twelve (12) months within the Performance Period or the Wind-Up from Purchaser or from an Affiliated Party.

**Annual Pricing Correction:** As defined in Article 6.

**Annual Report:** As defined in Article 8.

**Appointed Arbitrator:** As defined in Article 20.

**Acquisition Value Available:** As defined in Article 4.

**Audit Adjustment:** As defined in Article 18.

**Awarded Costs:** As defined in Article 20.

**Base Closure:** As defined in Article 3.

**Base Compensation:** As defined in Article 7.

**Benchmark Performance Ratio:** As defined in Article 2.

**Bid Category:** As defined in Part III.A.

**Bid Deposit:** As defined in Article 1.

**Bid Percentage:** The amount, expressed as a percentage of Acquisition Value, offered by Contractor on its Bid Schedule, Attachment III-2, with respect to items of Property in a particular Product Subpool Bid Category.

**Bid Price:** As defined in Part III.B.

**Bid Schedule Pool:** As defined in Part III.B

# EXHIBIT C

# MODIFICATION 9 TO CV2 CONTRACT



COPY

SALE OF GOVERNMENT PROPERTY
AMENDMENT OF INVITATION FOR BIDS/MODIFICATION OF CONTRACT

| 1. AMENDMENT TO INVITATION FOR BIDS NO.: | 2. EFFECTIVE DATE 08/15/06 | PAGE 1 OF 2 PAGES |
|---|---|---|

SUPPLEMENTAL AGREEMENT NO.:9

| 3. ISSUED BY | NAME AND ADDRESS WHERE BIDS ARE RECEIVED |
|---|---|
| DEFENSE REUTILIZATION AND MARKETING SERVICE INTERNATIONAL SALES OFFICE, ATTN:DRMS-BBS 74 N WASHINGTON STREET BATTLE CREEK MI 49017-3092 | DEFENSE REUTILIZATION AND MARKETING SERVICE INTERNATIONAL SALES OFFICE, ATTN:DRMS-BBS 74 N WASHINGTON STREET BATTLE CREEK MI 49017-3092 |

| ☐ AMENDMENT OF INVITATION FOR BIDS NO. *(See Item 6)* | DATED | ☒ MODIFICATION OF CONTRACT NO. *(See Item 8)* 99-0001-0002 | DATE 06/13/01 |
|---|---|---|---|

6. THIS BLOCK APPLIES ONLY TO AMENDMENTS OF INVITATIONS FOR BIDS
The above numbered invitation for bids is amended as set forth in Item 9. Bidders must acknowledge receipt of this amendment unless indicated otherwise in Item 11 prior to the hour and date specified in the invitation for bids, or as amended, by one of the following methods:
(a) By signing and returning _____ copies of this amendment;
(b) By acknowledging receipt of this amendment on each copy of the bid submitted; or
(c) By separate letter or telegram which includes a reference to the invitation for bids and amendment number.
FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE ISSUING OFFICE PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR BID. If by virtue of this amendment you desire to change a bid already submitted, such change may be made by telegram or letter, provided such telegram or letter makes reference to the invitation for bids and this amendment, and is received prior to the opening hour and date specified.

7. ACCOUNTING AND APPROPRIATION DATA *(if required)*

8. THIS APPLIES ONLY TO MODIFICATION OF CONTRACTS
This Supplemental Agreement is entered into pursuant to authority of   Mutual Agreement

9. DESCRIPTION OF AMENDMENT/MODIFICATION *(Except as provided below all terms and conditions of the document referenced in Item 5 remain in full force and effect)*

Whereas Contract 99-0001-0002 was entered into on June 13, 2001 by and between the United States of America, hereinafter referred to as the Government, and SURPLUS ACQUISTION VENTURE (SAV), LLC, hereinafter referred to as the Contractor, and GOVERNMENT LIQUIDATION (GL), LLC, formed by the contractor to serve as the entity that processes DRMS assets, hereinafter referred to as the Purchaser, and whereas the contract involved the following in Invitation For Bid 99-0001:

0001: All Federal Stock Classes (FSCs) listed in Table IV-1 of solicitation on the DRMS accountable record that are demilitarization code A, B, or Q, located at various U.S. (to include Alaska and Hawaii), Puerto Rico and Guam military installations.   Contract performance is 7 years.

THE HOUR AND DATE FOR RECEIPT OF BIDS ☐ IS NOT EXTENDED, ☐ IS EXTENDED UNTIL _____ O'CLOCK
(LOCAL TIME)      DATE

| 10. BIDDER/PURCHASER NAME AND ADDRESS *(Include ZIP Code)* SURPLUS ACQUISITION VENTURE, LLC 2131 K Street NW, 4th Floor Washington, DC 20037 | 11. ☐ BIDDER IS NOT REQUIRED TO SIGN THIS DOCUMENT ☒ PURCHASE IS REQUIRED TO SIGN THIS DOCUMENT AND RETURN ORIGINAL AND 0 COPIES TO THE ISSUING OFFICE |
|---|---|

| 12. SIGNATURE FOR BIDDER/PURCHASER BY _(signature)_ *(SIGNATURE OF PERSON AUTHORIZED TO SIGN)* | 15. UNITED STATES OF AMERICA BY _Rebecca Bellinger_ *(SIGNATURE OF CONTRACTING OFFICER)* |
|---|---|
| 13. NAME & TITLE OF SIGNER *(Type or print)* THOMAS B. BURTON President | 14. DATE SIGNED 8-15-06 | 16. NAME OF CONTRACTING OFFICER *(Type or print)* REBECCA BELLINGER | 17. DATE SIGNED 8-15-06 |

CONTRACT NUMBER 99-0001-0002
Supplemental Agreement 9
Page 2 of 3

WHEREAS, Invitation For Bid 99-0001, Article 5 – PAYMENT BY PURCHASER FOR PROPERTY, Section 2(B), states:  Each Invoice shall identify (i) an amount ("the DRMS invoiced Amount") equal to ninety-seven and seventy-five one-hundredths percent (97.75%) of the Total Invoiced Amount, and (ii) an amount (the "KGP Invoiced Amount") equal to two and twenty-five one-hundredths percent (2.25%) of the Total Invoiced Amount.   Purchaser shall pay to DRMS and to KGP the full amounts of the DRMS Invoiced Amount and the KGP Invoiced Amount, respectively, on or before the date that is fifteen (15) Days after each Invoice is submitted to Purchaser.

WHEREAS, Invitation For Bid 99-0001, Article 16 – DISTRIBUTIONS, Section 3(C), states:  Purchaser shall calculate the amount of the "KGP Net Worth Allocation" as Operating New Worth multiplied by one and eight one-hundredths percent (1.80%).

WHEREAS, Invitation For Bid 99-0001, Part II, GENERAL STATEMENTS OF CONTRACT TERMS, Paragraph A, ....As is also described more specifically below, the CV structure is also a "net proceeds sharing sale" in that the successful bidder is obligated to share with DRMS a portion (78.2%) of the net proceeds realized from the resale of the property after deducting all of the costs of managing, transporting, protecting, improving and marketing the property......

NOW, therefore, it is mutually agreed between the parties hereto that, effective with Delivery Order 254, KGP will no longer be entitled to payment (upfront/resale) for property transferring to purchaser under contract 99-0001-0002.  KGP will be entitled to the proceeds sharing arrangement (resale) set forth in contract 99-0001-0002 for all property transferred to purchaser prior to delivery order 254.  Effective with Delivery Order 254, the payment originally directed to KGP will be included in the proceed sharing arrangement to DRMS, thus making DRMS share equal to 80% rather than 78.2% after deducting KGP's portion.

Further, therefore, it is mutually agreed between the parties that:

1. Article 5, Section 2B is deleted in its entirety and replaced with the following:

   Purchaser shall pay to DRMS the full amount of the DRMS invoiced amount on or before the date that is fifteen (15) days after each invoice is submitted to purchaser.

2. Article 16, Section 3B is modified by deletion in its entirety and replaced with the following:

CONTRACT NUMBER 99-0001-0002
Supplemental Agreement 9
Page 2 of 3

Purchaser shall calculate the amount of the "DRMS New Worth Allocation" as Operating Net Worth <u>multiplied by</u> eighty percent (80.0%).

3.  Article 16, Section 3C is deleted in its entirety.

4.  Part II, Paragraph A, sentence 6, is deleted in its entirety and replaced with the following:

As is also described more specifically below, the CV structure is also a "net proceeds sharing sale" in that the successful bidder is obligated to share with DRMS a portion (80%) of the net proceeds realized from the re-sale of the property after deducting all of the costs of managing, transporting, protecting, improving and marketing the property.

All other terms and conditions remain unchanged and are in full force and effect.

//////////NOTHING FOLLOWS/////////

# EXHIBIT D

# MODIFICATION 11 TO CV2 CONTRACT

*This is an EDGAR HTML document rendered as filed. [ Alternative Formats ]*

**EXHIBIT 10.1**

SALE OF GOVERNMENT PROPERTY
AMENDMENT OF INVITATION FOR BIDS/MODIFICATION OF CONTRACT

| 1. AMENDMENT TO INVITATION FOR BIDS NO.: | 2. EFFECTIVE DATE | PAGE 1 OF 10 PAGES |
|---|---|---|

SUPPLEMENTAL AGREEMENT NO.: 11          09/12/06

| 3. ISSUED BY | NAME AND ADDRESS WHERE BIDS ARE RECEIVED |
|---|---|
| DEFENSE REUTILIZATION AND MARKETING SERVICE INTERNATIONAL SALES OFFICE, ATTN:DRMS-BBS 74 N WASHINGTON STREET BATTLE CREEK MI 49017-3092 | DEFENSE REUTILIZATION AND MARKETING SERVICE INTERNATIONAL SALES OFFICE, ATTN:DRMS-BBS 74 N WASHINGTON STREET BATTLE CREEK MI 49017-3092 |

| ☐ AMENDMENT OF INVITATION FOR BIDS NO. *(See Item 6)* | DATED | ☒ MODIFICATION OF CONTRACT NO. *(See Item 8)* 99-0001-0002 | DATE 06/13/01 |
|---|---|---|---|

6. THIS BLOCK APPLIES ONLY TO AMENDMENTS OF INVITATIONS FOR BIDS

The above numbered invitation for bids is amended as set forth in Item 9. Bidders must acknowledge receipt of this amendment unlessindicated otherwise in Item 11 prior to the hour and date specified in the invitation for bids, or as amended, by one of the following methods:

(a)  By signing and returning          copies of this amendment;

(b)  By acknowledging receipt of this amendment on each copy of the bid submitted; or

(c)  By separate letter or telegram which includes a reference to the invitation for bids and amendment number.

FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE ISSUING OFFICE PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR BID. If by virtue of this amendment you desire to change a bid already submitted, such change may be made by telegram or letter, provided such telegram or letter makes reference to the invitation for bids and this amendment, and is received prior to the opening hour and date specified.

7. ACCOUNTING AND APPROPRIATION DATA *(If required)*

8. THIS APPLIES ONLY TO MODIFICATION OF CONTRACTS

This Supplemental Agreement is entered into pursuant to authority of Mutual Agreement

9. DESCRIPTION OF AMENDMENT/MODIFICATION *(Except as provided below all terms and conditions of the document referenced in Item 5 remain in full force and effect)*

Whereas Contract 99-0001-0002 was entered into on June 13, 2001 by and between the United States of America, hereinafter referred to as the Government, and SURPLUS ACQUISITION VENTURE (SAV), LLC, hereinafter referred to as the Contractor, and GOVERNMENT LIQUIDATION (GL), LLC, formed by the contractor to serve as the entity that processes DRMS assets, hereinafter referred to as the Purchaser, and whereas the contract involved the following in Invitation For Bid 99-0001:

0001: All Federal Stock Classes (FSCs) listed in Table IV-1 of solicitation on the DRMS accountable record that are demilitarization code A, B, or Q, located at various U.S. (to include Alaska and Hawaii), Puerto Rico and Guam military installations. Contract performance is 7 years.

THE HOUR AND DATE FOR RECEIPT OF BIDS ☐ IS NOT EXTENDED, ☐ IS EXTENDED UNTIL          O'CLOCK (LOCAL TIME)          DATE

| 10. BIDDER/PURCHASER NAME AND ADDRESS *(Include ZIP Code)* SURPLUS ACQUISITION VENTURE, LLC 2131 K Street NW, 4th Floor Washington, DC 20037 | 11. ☐ BIDDER IS NOT REQUIRED TO SIGN THIS DOCUMENT ☒ PURCHASE IS REQUIRED TO SIGN THIS DOCUMENT AND RETURN ORIGINAL AND 0 COPIES TO THEISSUING OFFICE |
|---|---|

| 12. SIGNATURE FOR BIDDER/PURCHASER | 15. UNITED STATES OF AMERICA |
|---|---|
| BY          /s/ William Angrick *(SIGNATURE OF PERSON AUTHORIZED TO SIGN)* | BY          /s/ Neil A. Watters *(SIGNATURE OF CONTRACTING OFFICER)* |

| 13.NAME & TITLE OF SIGNER *(Type or print)* | 14. DATE SIGNED | 16. NAME OF CONTRACTING OFFICER*(Type or print)* | 17. DATE SIGNED |
|---|---|---|---|
| WILLIAM ANGRICK CEO | 9/12/2006 | NEIL A. WATTERS | 9/12/2006 |

SEC Info - Liquidity Services    - 8-K - For 9/12/06 - EX-10.1                                                    Page 3 of 13

CONTRACT NUMBER 99-0001-0002

Supplemental Agreement 11
Page 2 of 10

WHEREAS, DRMS has identified a need to strengthen procedures related to the proper identification and control of property to ensure that restricted property is not released to the public under Sales Contract Number 99-0001-0002; and

WHEREAS, the rules defining *"Controlled Property"* are dynamic due to frequent DEMIL code changes, evolving counter-terrorism policies and other business rules; and

WHEREAS, DRMS seeks to implement a comprehensive solution to mitigate the identified risks; and

WHEREAS, Surplus Acquisition Venture, LLC (*"Contractor"*) and its parent company Liquidity Services, Inc. (*"LSI"*) can leverage technology and surplus property domain expertise to develop and implement new inventory inspection and tracking procedures with respect to the property for resale that DRMS provides; and

WHEREAS, the Contractor shall undertake new inventory inspection and assurance procedures resulting in opportunity costs, and program management requirements not contemplated in the net proceeds sharing ratios under Sales Contract Number 99-0001-0002; and

**NOW, THEREFORE,** it is mutually agreed between the parties hereto to this modification that Contract Number 99-0001-0002 shall be amended as follows:

1.      ARTICLE THREE, SECTION 1(A), Titled, R/T/D Review:

**Add the following:**

1.  Effective December 1, 2006, Controlled Property shipped from a Hub Site to a Controlled Property Center (*"CPC"*) (see Art. Three, Section 3) will receive an additional level of Reutilization, Transfer and Donation (*"R/T/D"*) screening via a private web site developed by the Purchaser or via a data feed to GSA's R/T/D web site for a period of 2 business days (48 hours) prior to being released for sale. Transfer and Donation screening will not occur until the Property has been cleared for sale as defined in Section 3A of Article Three.

2.  Property that is requisitioned for Reutilization, Transfer or Donation by an authorized R/T/D customer will be returned to the DRMS, and will not migrate from the private R/T/D web site (or from the GSA R/T/D web site) to the Purchaser's public sales web site. The title to such property shall revert to DRMS and DRMS shall credit the Purchaser the amount of the Contractor's purchase price for any item of property returned hereunder.

3.  The Purchaser will pull the item from inventory and deliver it to the DRMS representative at the CPC who will arrange for the release of the item to the R/T/D customer.

CONTRACT NUMBER 99-0001-0002
Supplemental Agreement 11
Page 3 of 10

4.   It is anticipated that the volume of property that will be returned to the DRMS as a result of the additional R/T/D screening period will be approximately 12,000 line items per year. The Purchaser will receive compensation for R/T/D up to the estimated amount by increasing the net proceeds share by one percent (1%).

5.   If the actual volume of R/T/D exceeds 24,000 line items annually, DRMS and the Purchaser shall renegotiate an increase in the net proceeds sharing split between the parties.

6.   Effective upon the signing of this modification, Purchaser agrees to return property that has not been awarded to a resale customer that DRMS has identified as a mission essential reutilization requirement. DRMS will support all reutilization requirements with a mission impact statement advising that property is needed to satisfy an authorized requirement. Prior to notifying Purchaser of the reutilization requirement, DRMS will have ensured that current DRMS inventory is not available to satisfy the reutilization request. The title to such property shall revert to DRMS and DRMS shall credit the Purchaser the amount of the Contractor's purchase price for any item of property returned hereunder.

2.    ARTICLE THREE, SECTION 3, Titled, R/T/D of the Property; Property Storage; Delivery of Property to Purchasers and Passage of Title.

**(D)    Inventory Assurance Procedures for Batch Box Items.**

**(1)    Inventory Assurance.** Contractor and Purchaser have agreed to set up and implement an inventory assurance procedure for Batch Box Items and Local Stock Number (LSN) items, **except** for LSN items identified, low-risk FSCs, a list of which will be provided by and updated as needed by DRMS.

**(2)    Batch Boxes and LSN items (not identified at the Hub Site as *"low-risk"* FSC) (*"Controlled Property"*) to Controlled Property Center.** DRMS shall ship all Controlled Property to a CPC where batch boxes will be broken down, inspected, and the item identification verified by Purchaser's personnel (with Government oversight) as set forth herein.

**(3)    Scanning Process.** Purchaser's personnel, using Contractor's proprietary barcode technology and any enhancements made thereto, will scan the National Stock Number (NSN) from the DD Form 1348-1A. The technology will allow Purchaser to check the data against a DRMS created and maintained *"Controlled Property Restricted List"* Database that DRMS will update and provide to Purchaser at an agreed upon frequency (the *"Controlled Property Restricted List"*). If the scan reveals that the Batch Box Item or LSN is on the Controlled Property Restricted List or item identification cannot be determined (refer to Section 3A(C) for further LSN guidance), then the item will be returned to DRMS and Purchaser shall receive a credit for the contractor's purchase price for those items. The title to such property shall revert to DRMS. DRMS shall, at its sole expense, remove all items identified as not eligible for sale from the CPC, or provide at its sole expense, warehousing space for such items separate from any warehousing space used for the property. For NSN items, DRMS acknowledges for the purposes of this screening process that the

CONTRACT NUMBER 99-0001-0002
Supplemental Agreement 11
Page 4 of 10

Purchaser is relying on the accuracy of the information contained on the DD Form 1348-1A accompanying each property item it receives and visual inspection of the Controlled Property. All items determined to be eligible for sale shall proceed through the sales pipeline after Government physical verification and approval, such verification and approval to be completed in a good faith timely manner.

**(4)      Inadequate Documentation.** If Batch Box Items contain illegible or inadequate documentation necessary to determine whether the item falls within the Controlled Property Restricted List, then Purchaser shall set the item aside and conduct a further investigation with DRMS to confirm whether the item is deemed to be a Controlled Property Restricted item. DRMS and Purchaser agree to work together in good faith to establish business rules regarding the required level of detail for specific FSCs and commodity types for adequate risk management. If DRMS determines an item is not eligible for sale, then DRMS shall dispose of such items as it would other items falling within the Controlled Property Restricted List and Purchaser shall receive a credit for the Contractor's Purchase Price for those items. The title to such property shall revert to DRMS.

**(5)      Warehouses for Inventory Assurance.** Notwithstanding any other provision of this Contract to the contrary, DRMS, at its sole expense, agrees to provide Purchaser additional warehouses with approximately 140,000 square feet of space at each location when available to serve as a CPC for the scanning procedures described in this Section 3(D), based on a good faith effort by DRMS to acquire such space. The CPCs will be established in locations that are mutually agreed upon between the Purchaser and DRMS, and may be altered as needed to facilitate performance requirements. The Purchaser will provide the DRMS with proof of receipt of property at all CPCs by line item. Any discrepancies in quantities will be mutually researched and resolved by DRMS and the Purchaser. Purchaser will retain item visibility of all items until released for sale to the public.

**(6)      Continuing Review of Items Lotted For Sale.** Periodically, at an agreed upon frequency (no less frequently than weekly and no more frequently than daily), the DRMS agrees to provide data to the Purchaser and the Purchaser agrees to conduct a scan of Property items received against the Controlled Property Restricted List. If the scan reveals that any item received is on the Controlled Property Restricted List, then the item shall be removed from the Purchaser's sales pipeline and returned to DRMS or another disposition as agreed, at the sole expense of DRMS. The title to such property shall revert to DRMS. Purchaser shall receive a credit for the Contractor's Purchase Price for those items.

**(7)      Report of Restricted Items.** Purchaser agrees to supply DRMS on an agreed upon frequency a report in a machine readable format that lists the items that the Purchaser determined fell within the scope of the Controlled Property Restricted List through the procedures described in Section 3(D)(3). Additionally, the Purchaser shall make available to the DRMS verifier for inspection all potentially Controlled items identified by the Purchaser as *"safe to sell."* DRMS will provide to the Purchaser current batch lotting procedures. Purchaser will identify discrepant items discovered by DTID number of the batch lot for tracking and reporting purposes. On

site DRMS personnel will determine the proper method of disposal for discrepant property at the sole expense of DRMS. Title to such property shall revert to DRMS. Purchaser shall receive a credit for the Contractor's Purchase Price fo those items.

**(8)    Duty to Cooperate.** DRMS and Purchaser shall cooperate as is reasonably required to **implement** the inventory assurance procedures set forth in this Section 3(D).

**(9)    Start Date.** As the CPCs become operational, but not later than December 1, 2006, all batch box and LSN property, including aged property already referred to the Purchaser, will be processed through the CPCs, unless otherwise approved by DRMS.

3.        ARTICLE SIX, SHALL BE AMENDED TO ADD THE FOLLOWING AS SECTION 3A:

**Section 3A. Controlled Property Restricted List**

(A)        Not later than December 1, 2006, Purchaser, on a weekly basis, shall compare their National Stock Number (NSN) records of property received against the DRMS Controlled Property Restricted List as described in Article 3, Section 3(D). Purchaser agrees to remove all property found on the Controlled Property Restricted List from the sale lot and return such property to DRMS or another disposition as agreed upon by the parties, and at the sole risk and expense of DRMS. The title to such Property shall revert to DRMS upon Purchaser's disposition of the Property as instructed by DRMS.

(B)        Not later than December 1, 2006, Purchaser shall match all incoming delivery orders for their respective property flows against the DRMS Controlled Property Restricted List as described in Article 3, Section 3(D). Purchaser agrees that any property found on the Controlled Property Restricted List will be returned to DRMS or another disposition as agreed upon by the parties, at DRMS's sole risk and expense. The title to such property shall revert to DRMS upon return to DRMS control.

(C)        The parties understand that Local Stock Numbers ("*LSNs*") cannot be checked systemically as they do not typically contain identifiable National Item Identification Numbers (NIINs). Purchaser agrees, at the time of lotting for sale, to visually inspect and scrutinize each LSN item. All LSN items determined to be eligible for sale shall proceed through the sales pipeline after Government physical inspection and approval, such verification and approval to be completed in a good faith timely manner. If the LSN item upon inspection is unidentifiable or of suspect use, the Purchaser shall contact the Government Controlled Property Center, Controlled Property Verifier for further instruction. If the Government representative determines the item is not eligible for sale, the Purchaser agrees that the item will be considered a Controlled Property Restricted List item and the Purchaser agrees the property will not be identified for sale. The title to any such Property shall revert to DRMS upon return to DRMS control. Additionally, the Purchaser shall make reasonably available to the Government Verifier for inspection all items identified by the Purchaser as "*safe to sell*" for verification. Purchaser will perform research to identify the LSN to an NSN if possible. Items that are not authorized for sale by the Government Verifier will be returned to the DRMS for proper disposal. The title to any such property shall revert to DRMS.

CONTRACT NUMBER 99-0001-0002
Supplemental Agreement 11
Page 6 of 10

    (D)    Purchaser agrees to provide DRMS a regular reporting at a mutually agreed upon frequency identifying all items that Purchaser returned from their property flows in accordance with Section 3A(A), 3A(B), or 3A(C) above.

    (E)    DRMS shall credit the Purchaser the amount of the Contractor's Purchase Price for any item of Property returned as provided in Section 3A(A), 3A(B), and 3A(C) above. The amount of any credit to which this section entitles Purchaser shall be deducted from the amount of DRMS' next invoice to the Purchaser. If there are no more Invoices forthcoming, the next Distributions shall be adjusted for such credit. If no more Distributions are forthcoming, DRMS shall issue Contractor a check for the amount of the credit.

4.    ARTICLE NINE, SECTION 1(B) SHALL BE REVISED TO STATE:

**(B)**    **Seller Indirect Costs.**

    *"Seller Indirect Costs"* are (i) subject to the provisions and limitations of Section 4(F) of Article 3, all costs that are actually incurred by Purchaser for the packing, loading and transport of Property referred for sale to Purchaser at a DLA Depot, Restricted Access Facility, or Special Situation Location, that does not allow on-site processing, and either (1) paid to any Person that is not an Affiliated Party or (2) paid to an Affiliated Party and constituting one of the *"Permitted Affiliate Transactions"* identified at Schedule VI.7.3.(C), (ii) the actual and minimum reasonable costs incurred by Purchaser to comply with administrative or other requirements by DRMS as agreed to by Purchaser, or (iii) as otherwise provided herein. All costs incurred by Purchaser and Contractor in implementing, developing, or enhancing the Inventory Assurance Procedures specified in Article 3, Section 3 (D), or those procedures to set aside Restricted Items specified in Article Six, Section 3A shall be considered Seller Indirect Costs. First year start up Seller Indirect Costs associated with this process will not exceed $5 million.

5.    ARTICLE SEVEN, SECTION 5 SHALL BE AMENDED TO ADD THE FOLLOWING SUBSECTION (G):

    Purchaser shall provide DEMIL Code A buyer information to DCIA upon the receipt of a judicial or administrative subpoena, specifying the information being requested. Customer information will include all information provided to the Purchaser by the customer during the course of bid receipt and contract award. If property sold as DEMIL Code A, however, is later found to have changed to any DEMIL code other than A, Purchaser will assist DCIA in the course of an investigation as if the property were in fact, sold as DEMIL Code B or Q and will provide DRMS upon request, all information provided to Purchaser by the customer during the course of bid receipt and contract award. Purchaser shall cooperate and provide an administrative point of contact for all DCIA requests for assistance.

6.    ARTICLE SEVEN, SECTION 4 FIRST PARAGRAPH SHOULD BE AMENDED AS FOLLOWS:

    Any classified material, demilitarization required or hazardous property, or any other property on the Controlled Property Restricted List, as defined in Article 23 of the CV contract,

Case 1:08-cv-00423-HHK    Document 4-5    Filed 03/17/2008    Page 9 of 12

CONTRACT NUMBER 99-0001-0002
Supplemental Agreement 11
Page 7 of 10

not covered by this underline contract, found while in the possession of contractor, Purchaser, or any subcontractor(s) or in or among the property must be immediately returned to Government control as directed by the SCO at Government expense. Purchaser is not authorized to sell any of the property listed above.

ARTICLE SEVEN, SECTION 4 SHALL BE AMENDED TO ADD THE FOLLOWING LANGUAGE AFTER THE FIRST PARAGRAPH:

The Purchaser shall make a good faith effort to retrieve property sold to the public that should have carried a DEMIL required Code barring the sale, by sending a letter via registered mail or trackable courier service (e.g., FedEx, DHL, etc.) to the customer advising them of the requirement to return mistakenly released property, and advising them of the possible consequences of non-compliance with the terms and conditions of sale. Purchaser will also make a second effort to contact the customer via registered mail or trackable courier services within 30 days of the first letter contract should resolution not been attained. After issuing the second communication with the customer requesting the return of the property, the customer name, contact information, and item released will be referred to DRMS for additional action and Purchaser will also provide DRMS upon request, any further information provided to Purchaser by the customer during the course of bid receipt and contract award.

In the event that any Ammunition, Explosive or Dangerous Articles (AEDA) are discovered by the Purchaser, they will be reported immediately to the Government on-site representatives. Purchaser will provide DRMS a list of the buyers and property involved under this section on a monthly basis.

7.       ARTICLE SEVENTEEN, SECTION 2, SHALL BE AMENDED TO ADD THE FOLLOWING LANGUAGE:

(C)      DRMS shall provide oversight of the Purchaser's Controlled Property Verification Process, using Controlled Property Verifiers, who DRMS will assign to the Controlled Property Centers. DRMS Verifiers will have access to the property throughout all stages of the property handling process at the CPCs.

8.       ARTICLE 23 SHALL BE AMENDED TO ADD THE FOLLOWING DEFINITION:

**Batch Box Items**: One line item (DTID) consisting of multiple turn-in documents and items.

**Controlled Property:** Any property which DRMS determines is potentially not saleable due to its DEMIL Code, its end-use, or should not be sold to the general public for any reason related to national security or other statutory obligations of the Federal Government. DRMS shall determine the Business Rules governing how Controlled Property is determined, and those rules shall be communicated to the Purchaser.

CONTRACT NUMBER 99-0001-0002
Supplemental Agreement 11
Page 8 of 10

**Controlled Property Center (CPC):** A centralized processing facility that is manned by DRMS and Purchaser personnel. Controlled Property is sent both from Hub Sites and received directly from generators. CPC personnel review and DRMS personnel certify that the Controlled Property is *"saleable"* or determine that the property cannot be sold and must be returned.

**Controlled Property Restricted List:** A DRMS-maintained and provided list by which property will be screened against to determine whether it can be sold or transferred to a R/T/D customer. The list is comprised of controlled items based on demilitarization code or other factors relating to National security as determined by DRMS.

**Hub Site:** A location where DRMS receives, stores and issues property.

9.       PART II, A. *"INTRODUCTION"* SHOULD BE AMENDED AS FOLLOWS:

**Change** the lines 11 to 14 (after *"property"*) of the first paragraph **to read as follows,**

"with DRMS a portion (ranging between 69.5% and 75% based on the Purchaser meeting or failing to meet certain performance benchmarks) of the net proceeds realized from the re-sale of the property after deducting all of the costs of managing, transporting, protecting, improving and marketing the property.

10.      PART II, M. *"DISTRIBUTIONS AND PAYMENTS"* SHOULD BE AMENDED AS FOLLOWS:

**Eliminate paragraph three of this section and replace with the following paragraph:**

The Purchaser must pay to DRMS a variable share of the net proceeds ranging between 69.5% and 75% (as further explained in Article Sixteen below) of all Net Proceeds (less any required increase in the cash reserve). The Purchaser must pay to Contractor a variable share (dependent on the variable amount paid to DRMS and intended to always equal 100%) of between 25% and 30.5% of all Net Proceeds (less any such increase in the cash reserve). (See Art. 16.)

11.      ARTICLE SIXTEEN, SECTION 3(A) SHOULD BE AMENDED AS FOLLOWS:

(A)      Calculate Contractor Net Worth Allocation.

Purchaser shall calculate the amount of the *"Contractor Net Worth Allocation"* as Operating Net Worth multiplied by twenty-seven and one half percent (27.50%) (twenty-eight and one half percent (28.50%) if R/T/D is accomplished).

12.      ARTICLE SIXTEEN, SECTION 3(B) SHOULD BE AMENDED AS FOLLOWS:

(B)      Calculate DRMS Net Worth Allocation.

CONTRACT NUMBER 99-0001-0002
Supplemental Agreement 11
Page 9 of 10

Purchaser shall calculate the amount of the *"DRMS Net Worth Allocation"* as Operating Net Worth multiplied by seventy-two point five percent (72.5%) (71.5% if R/T/D is accomplished).

13.     ARTICLE SIXTEEN, SECTION 3 SHOULD BE AMENDED BY ADDING SUB-SECTION (D), *"INCENTIVES"*:

(D)     The operating revenue share of Purchaser effective immediately on execution of this Supplemental Agreement is twenty seven point five percent (27.5%) (twenty eight point five percent (28.5%) if R/T/D is accomplished) for purposes of all distributions under the contract moving forward.  DRMS has indicated that the United States Government Accountability Office (*"GAO"*) intends to conduct audits of improper Controlled Property Restricted List sales.  To provide Purchaser with an added financial incentive to minimize screening failures with respect to property on the Controlled Property List, DRMS and Purchaser have agreed to this incentive provision, based on the number of *"failures"* identified in subsequent audits.  The incentive provision shall commence December 1, 2006.  The net proceeds share of Purchaser for purposes of all distribution payments made or accrued under the contract from the date this modification is signed until December 1, 2006 shall be 27.5% (28.5% if R/T/D is accomplished).

A *"failure"* for purposes of this provision is defined as the discovery of individual sales item(s) from the Controlled Property Restricted List on Purchaser's website available to the public, or a subsequent sale to the public or the GAO after December 1, 2006, as discovered by: (1) the GAO; (2) by any other entity presenting its findings to a Congressional Committee or Subcommittee; or (3) by any other independent review(s) mutually agreed to by DRMS and Purchaser by November 30, 2006.  Beginning December 1, 2006, Purchaser's net proceeds sharing percentage for the next calendar year shall be retroactively adjusted for the audited calendar year only (with the then current period continuing at the operating Purchaser net proceeds share of 27.5% (28.5% if R/T/D is accomplished) according to the following matrix:

| Number of Failures by Purchaser* | Change in Net Proceeds Baseline without R/T/D Option | Change in Net Proceeds Sharing with R/T/D Option |
|---|---|---|
| ≤ 25 | 30.5% | 30.5% |
| 26 to 80 | 28.5% | 28.5% |
| 81 to 120 | 27.5% | 28.5% |
| ≥ 121 | 25% | 26% |

The number of failures in the above table reflect a 6-month review period and shall be adjusted to reflect the sampling period (shorter or longer), used by the GAO, any other entity presenting its findings to a Congressional Committee or Subcommittee or by any other independent review(s) mutually agreed to by DRMS and Purchaser, in order to reflect equitable performance measures.  September of the Fiscal Year will be the cut-off to determine the performance ratios.  If there has been no independent verification of the Purchaser's performance, the Purchaser shall receive the 30.5 percent split.  If there has been an independent verification, then the ratio will be determined

CONTRACT NUMBER 99-0001-0002
Supplemental Agreement 11
Page 10 of 10

no later than September 30ᵗʰ of the previous Fiscal Year's performance. The Purchaser's split will revert back to the baseline and be in effect until the next reporting timeframe.

If based on the number of *"failures"* as defined and computed above, it is determined that Purchaser is due an additional amount for the period in question, Purchaser shall identify the increased amount due on the next Distribution Statement and account for and recover the incentive amount as a Seller Indirect Cost. If based on the audit report (and allowing 30 days from receipt for Purchaser and DRMS to discuss the results), it is determined that Purchaser owes DRMS as a result of the discovery of 121 or more failures in the prior six months. Purchaser shall identify the amount due to DRMS in writing (to be concurred in by DRMS) and issue DRMS a check within 60 days of Purchaser's receipt of the audit report.

  14. ATTACHMENT VI.16.1, MONTHLY DISTRIBUTION STATEMENT SHOULD BE AMENDED AS FOLLOWS:

  Pages 118, No. 3, change the allocation from 20.0% to 27.5% (28.5% of R/T/D is accomplished) and from 78.2% to 72.5% (71.5% if R/T/D is accomplished).

  15. ALL OTHER APPLICABLE TERMS AND CONDITIONS OF THE CONTRACT REMAIN IN EFFECT, INCLUDING BUT NOT LIMITED TO PARTS I-VI, AND ARTICLES ONE (1) THROUGH TWENTY THREE (23); AND

  16. THIS MODIFICATION WILL BECOME EFFECTIVE UPON THE DATE OF THE LAST AFFIXED SIGNATURE TO THE MODIFICATION.

  ///////////////////////////////////// **NOTHING FOLLOWS** /////////////////////////////////

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ———————————————————— | ) | |
| KORMENDI/GARDNER PARTNERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  1:08-cv-00423-HHK |
| | ) | |
| SURPLUS ACQUISITION VENTURE, LLC and | ) | |
| GOVERNMENT LIQUIDATION.COM, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————————— | ) | |

### ORDER

Defendants Surplus Acquisition Venture, LLC and Government Liquidation.com, LLC moved this Court: (i) pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the complaint by Plaintiff Kormendi/Gardner Partners with prejudice; or, in the alternative, (ii) pursuant to Fed. R. Civ. P. 12(b)(7) and Fed R. Civ. P. 19(b) to dismiss the Complaint without prejudice.  Upon consideration of the Motion, including consideration of memoranda of law submitted by the parties to this litigation and oral argument on this matter, it is hereby:

ORDERED that the Motion is GRANTED; and it is further

ORDERED that the Complaint in this case against Defendants is DISMISSED WITH PREJUDICE, pursuant to Federal Rule of Civil Procedure 12(b)(6).


Dated: _____ __, 2008

_____
United States District Judge